**WOODCREST ASSOCIATES, LTD., Appellant,**

v.

**COMMONWEALTH MORTGAGE CORPORATION, Appellee.**

No. 05–88–01239–CV.

Court of Appeals of Texas, Dallas.

Aug. 1, 1989.

Rehearing Denied Sept. 8, 1989.

---

ROWE, Justice.

Appellee Commonwealth Mortgage Corporation [Commonwealth] brought this action against Woodcrest Associates, Ltd. [Woodcrest] to secure possession and control of an apartment complex which Woodcrest had pledged as security for a loan. Woodcrest filed a counterclaim against Commonwealth seeking penalties for usury. After a non-jury trial, the trial court awarded possession and control of the complex to Commonwealth and denied Woodcrest all relief on its counterclaim. In six points of error, Woodcrest complains that: 1) the trial court erred in holding that the "usury savings clauses" in the loan documents precluded Commonwealth from making a usurious charge of interest; 2) the trial court erred in holding that Woodcrest did not have an absolute obligation to repay the loan; 3) there was no evidence or insufficient evidence to support the trial court's finding that the loan commitment fee was paid as separate consideration for Commonwealth's commitment to make and close the loan; 4) the trial court erred in holding that the loan commitment fee was not paid by Woodcrest for the use, forbearance, or detention of proceeds of the loan; 5) the trial court erred in holding that Commonwealth's demand for $14,385,238 did not constitute a charge of additional interest; and 6) the trial court erred in refusing to enter judgment in favor of Woodcrest on its counterclaim. In one cross point, Commonwealth urges that Texas usury law did not apply to the transaction. For the reasons discussed below, we affirm the trial court's judgment.

## Background

In January 1983, Commonwealth loaned Woodcrest money to purchase an apartment complex. The proceeds of the loan were allocated as follows:

Patrick F. McManemin, William A. Smith, Dallas, for appellant.

Larry M. Lesh, Dallas, for appellee.

Before McCLUNG, ROWE and BURNETT, JJ.

| | | |
|---|---|---|
| SITE ALLOCATION (Cash down payment) | | $ 4,985,538 |
| LOAN FEES | | 1,172,004 |
| Loan brokerage and origination | 328,230 | |
| Commitment fee | 328,230 | |
| Noncompetition fee | 437,641 | |
| End-loan commitment fee | 78,903 | |

| | |
|---|---:|
| CLOSING ALLOCATION | $55,000 |
| CONTINGENCY AND OTHER ALLOCATIONS | 2,511,918 |
| REFURBISHING ALLOCATION | 284,000 |
| PRIOR DEBT ALLOCATION | 5,017,740 |
| TOTAL LOAN AMOUNT | $14,027,200 |

As security for this loan, Woodcrest executed a deed of trust encumbering the property, an assignment of rents, and an assignment of contracts and sale proceeds. The loan agreement expressly provided that neither Woodcrest nor any of its partners would have any personal liability with respect to the loan and that Commonwealth's sole recourse would be against the property securing the loan.

At the time of this purchase, the apartment complex was subject to a first lien mortgage in favor of Traveler's Insurance Company [Traveler's]. Rather than extinguishing this mortgage, the transaction was structured such that if Woodcrest had no negative cash flow, Woodcrest would make monthly installment payments to Commonwealth which would immediately remit such payments to Traveler's to service the preexisting debt. In addition, the loan proceeds included a prior debt allocation which Commonwealth was entitled to withhold until Traveler's released or transferred to Commonwealth its lien on the apartment complex. In the event that Woodcrest failed to provide adequate funds to service the Traveler's debt, the loan agreement authorized Commonwealth to draw the amount necessary to service the debt from the "Contingency and Other Allocations" funds. If for any reason a default occurred on the Traveler's note, the loan agreement authorized Commonwealth to pay in full the Traveler's debt from the prior debt allocation.

At closing, Commonwealth only advanced $5,040,538 which represented the site and closing allocations. Commonwealth also debited the available balance for the loan fees. Commonwealth did not initially advance funds under the contingency, refurbishing, or prior debt allocations. Subsequently, pursuant to the loan agreement, Commonwealth serviced the Traveler's debt and its own debt with the contingency allocation, eventually exhausting those funds. Commonwealth also exhausted the refurbishing allocation servicing the Traveler's debt.

On April 2, 1986, Commonwealth gave notice to Woodcrest that it was in default for failing to pay monthly installments due on the Commonwealth loan. In April and May, Woodcrest failed to provide any funds to service the Traveler's debt although it had some positive net operating income. On May 27, 1986, Commonwealth gave notice to Woodcrest that if the existing defaults were not cured, Commonwealth would accelerate the maturity of the notes and proceed with foreclosure of the deed of trust. On June 9, 1986, Commonwealth accelerated the maturity of the loan and demanded $14,137,826.15 to satisfy the loan in full. On July 14, 1986, Commonwealth gave notice to Woodcrest that it was exercising its right under the assignment of rents to collect all rental and other income from the property and instructed Woodcrest to pay over to it all such income in Woodcrest's possession. Commonwealth also amended its demand to reflect $14,385,238.00 to pay the loan in full. In a subsequent letter dated July 21, 1986, Commonwealth itemized this demand roughly as follows:

| | |
|---|---:|
| Principal balance owing to Commonwealth | $ 8,650,319.87 |
| Amount required to pay in full the Underlying Note to Traveler's | 5,007,273.71 |
| Reimbursement to Commonwealth for interest, tax and insurance escrows, and late charges paid to Traveler's on April 1, May 1, and June 1, 1986, following Woodcrest's default | 159,824.48 |
| Interest owed to Commonwealth on installments due between February 1 and June 1, 1986, and post default interest on past due amounts owed after acceleration of the loan | 567,819.94 |
| | $14,385,238.00 |

In reply, Woodcrest denied that a default existed and counterdemanded "that Commonwealth pay over to it $25,742,046.76 as damages for usurious interest demanded

in" Commonwealth's July 14, 1986 acceleration letter. As the basis for this counterdemand, Woodcrest claimed that the amount demanded by Commonwealth in its demand letters included interest in excess of that permitted by usury laws. Woodcrest asserts that such sum exceeded the amount actually funded by Commonwealth by more than $6,000,000. In particular, Woodcrest alleged that the amount demanded included $5,007,273.21 to satisfy the Traveler's debt, that the Traveler's debt was not in default, and that Commonwealth was not obligated to satisfy the Traveler's debt. Woodcrest also argued that all of the loan fees were actually disguised interest and that there was no separate consideration for such fees.

At trial, Woodcrest conceded that if Commonwealth's claim did not violate the usury laws, Woodcrest was in default under the loan. The trial court concluded that all of the loan fees other than the loan commitment fee were paid for the use, forbearance, or detention of the loan proceeds. It concluded, however, that Commonwealth's inclusion in its demand letters of the amount necessary to satisfy the Traveler's debt, including the prepayment penalty, and of the amount advanced from the contingency allocation to make the monthly payments did not constitute a charge of additional interest. The trial court also made the following conclusions of law:

1) The loan agreement, notes, and deed of trust contained enforceable clauses that precluded Commonwealth from charging or receiving usurious interest on the loan.

2) Woodcrest did not have an absolute obligation to pay the notes or other sums becoming due pursuant to the loan or sums demanded by Commonwealth in its demand letters.

3) Woodcrest is not entitled to the relief sought in its counterclaim.

### Usury Savings Clauses

■ A lender commits usury if it contracts for, charges, or receives interest greater than the maximum amount allowed by law. TEX.REV.CIV.STAT.ANN. art. 5069–1.06 (Vernon 1987). Woodcrest does not contend that Commonwealth contracted for or received usurious interest. [Brief of Appellant at 18]. Instead, Woodcrest claims that Commonwealth's July 14, 1986 demand letter constitutes a charge of usurious interest. A demand letter sent by a lender's attorney can be a "charge" within the meaning of the statute. *Coppedge v. Colonial Sav. & Loan Ass'n,* 721 S.W.2d 933, 936 (Tex.App.—Dallas 1986, writ ref'd n.r.e.); *Dryden v. City Nat'l Bank,* 666 S.W.2d 213, 221 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.); *see Danziger v. San Jacinto Sav. Ass'n,* 732 S.W.2d 300, 304 (Tex.1987). We must determine, however, whether such "charge" by its terms is for usurious interest.

In its first point of error, Woodcrest claims that the trial court erred in concluding that the usury savings clauses in the loan documents precluded Commonwealth from "charging" usurious interest. Woodcrest argues that the language of the loan documents does not directly address the charging of usurious interest. Thus, while the savings clauses may have prevented Commonwealth from contracting for or receiving usurious interest by their terms, they did not preclude Commonwealth from unilaterally charging usurious interest in its demand letters. Woodcrest further argues that enforcing these savings clauses with respect to a lender's unilateral conduct in charging usurious interest would totally eviscerate the usury laws.

■ Texas courts have repeatedly acknowledged the validity of usury savings clauses and enforced such clauses to defeat a violation of the usury laws. *See, e.g., Tanner Dev. Co. v. Ferguson,* 561 S.W.2d 777 (Tex.1977); *Nevels v. Harris,* 129 Tex. 190, 102 S.W.2d 1046 (1937); *Conte v. Greater Houston Bank,* 641 S.W.2d 411, 418 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.); *Spanish Village Ltd. v. American Mtg. Co.,* 586 S.W.2d 195, 201–02 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.); *see also In re Casbeer,* 793 F.2d 1436, 1447 (5th Cir.1986); *Mack v. Newton,* 737 F.2d 1343, 1371 (5th Cir.1984); *Rickman v. Modern American Mtg. Corp.,* 583

F.2d 155, 158–59 (5th Cir.1978), *cert. denied,* 441 U.S. 962, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979); *Imperial Corp. of America v. Frenchman's Creek Corp.,* 453 F.2d 1338, 1344–45 (5th Cir.1972); *but see Terry v. Teachworth,* 431 S.W.2d 918, 926 (Tex.Civ.App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.). The mere presence of such a clause, however, will not rescue a transaction that is necessarily usurious by its explicit terms. *Nevels,* 129 Tex. at 198, 102 S.W.2d at 1050; *Mack,* 737 F.2d at 1371; *Terry,* 431 S.W.2d at 926. The effect of such clauses in a particular case is largely a question of construing the terms of the savings clauses as a whole and in light of the circumstances surrounding the transaction. *Nevels,* 129 Tex. at 197–98, 102 S.W.2d at 1049–50; *Imperial,* 453 F.2d at 1344.

The loan agreement in this case contained the following usury savings clause:

All agreements between Borrower and Lender, whether now existing or hereafter arising and whether written or oral, are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration of the maturity of the Loan or otherwise, shall the amount paid, or agreed to be paid, to Lender for the use, forbearance or detention of the money to be loaned hereunder or otherwise, or for the payment or performance of any covenant or obligation contained herein or in the Note, Deed of Trust or in any other Loan Document, exceed the maximum amount permissible under applicable law. If from any circumstance whatsoever fulfillment of any provision hereof or of the Note, Deed of Trust or other Loan Documents, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity.

Each of the notes and the deed of trust contained a similar savings clause, which provided:

[I]t is agreed that the aggregate of all interest and other charges constituting interest, or adjudicated as constituting interest, and contracted for, chargeable, or receivable ... in connection with this loan transaction shall under no circumstances exceed the maximum amount of interest permitted by applicable law. In the event the maturity of the Note is accelerated ... then earned interest may never include more than the maximum rate of interest permitted by applicable law, computed from the dates of each advance of the loan proceeds outstanding until payment.

The loan agreement, notes, and deed of trust further provided that any excess interest received by Commonwealth would be allocated to reduce the unpaid principal and that any amount greater than the unpaid principal would be refunded to Woodcrest. All of these documents also contained clauses spreading any excess interest evenly throughout the term of the loan.

■ In construing the loan documents, we must ascertain and give effect to the objective intention of the parties as expressed in the written instruments. *See, e.g., Westwind Exploration, Inc. v. Homestate Sav. Ass'n,* 696 S.W.2d 378, 382 (Tex.1985); *Walker v. Temple Trust Co.,* 124 Tex. 575, 577, 80 S.W.2d 935, 936 (1935); *Imperial,* 453 F.2d at 1344. We must presume that the parties intended to obey the law unless the contrary plainly appears. *See, e.g., Nevels,* 129 Tex. at 197, 102 S.W.2d at 1049–50; *Conte,* 641 S.W.2d at 418; *Spanish Village,* 586 S.W.2d at 200. If possible, we must give effect to all parts of the contracts. *Nevels,* 129 Tex. at 197, 102 S.W.2d at 1049; *Spanish Village,* 586 S.W.2d at 200. Thus, if it is reasonably possible to give some effect to the savings clauses, we must interpret them in a manner which would deny Commonwealth the right to collect usurious interest. *Nevels,* 129 Tex. at 198, 102 S.W.2d at 1050; *Imperial,* 453 F.2d at 1343.

■ From our review of the loan documents and, in particular, the savings clauses, we conclude that the manifest intent of the parties was to structure the entire transaction so as to avoid contracting for, charging, or receiving usurious in-

terest. The testimony at trial revealed that both parties were well aware of the potential usurious nature of the transaction, especially with regard to the various loan fees. The aggressive draftsmanship of the documents reflects an intent that Commonwealth collect as much of the agreed upon fees as possible without violating the usury laws. Therefore, if at all possible, we must give effect to this intent in the present case.

In its July 14, 1986 demand letter, Commonwealth demanded $14,385,238.00 to satisfy the loan in full. Had Commonwealth merely demanded the "full unpaid principal balance" without specifying any amount, we would have no trouble enforcing the savings clauses and construing such demand as charging only an amount of interest within the lawful limit. *See Tanner Dev. Co. v. Ferguson,* 561 S.W.2d 777, 788–89 (Tex.1977) (op. on reh'g); *Rickman v. Modern American Mtg. Corp.,* 583 F.2d 155, 158–59 (5th Cir.1978), *cert. denied,* 441 U.S. 962, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979). We do not think, however, that merely including a specific amount necessarily precludes enforcement of the savings clauses.

Each of the demand letters sent by Commonwealth's attorneys explicitly referred to Woodcrest's obligations under each of the loan documents. The letters clearly evidence Commonwealth's intent to enforce its rights under such documents as a result of Woodcrest's default. Other than the inclusion of a specific sum, nothing in the letters indicates any claim to an amount not authorized by the underlying loan documents. The savings clauses in each of the notes and in the deed of trust expressly state that all interest "contracted for, *chargeable,* or receivable ... in connection with this loan transaction shall under no circumstances exceed the maximum amount of interest permitted by applicable law" [emphasis added]. The savings clause in the loan agreement further provided that if fulfillment of any provision of the loan documents involved "transcending the limit of validity prescribed by law, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity." In-terpreting the demand letters as a whole in light of the underlying loan documents, we construe Commonwealth's demand as being automatically constricted within the bounds of law by virtue of the savings clauses in the underlying documents thereby eliminating the contention that illegal interest was claimed. *See Rickman,* 583 F.2d at 158–59. We overrule Woodcrest's first point of error.

Since our disposition of Woodcrest's first point of error independently supports the trial court's judgment in full, we need not address its remaining points or Commonwealth's sole cross point. We affirm the trial court's judgment.