**Donald E. ARMSTRONG, Trustee of the Donald E. Armstrong Family Trust and the Donald E. Armstrong Charitable Remainder Unitrust; Boy'S Clubs of San Diego; Jennifer Potter; Jerry B. James; and the National Ability Center, Appellants,**

v.

**STEPPES APARTMENTS, LTD. and John L. Feece, Appellees.**

No. 2–97–250–CV.

Court of Appeals of Texas, Fort Worth.

July 6, 2001.

Wes Dauphinot and Thomas F. Harkins, Jr., Fort Worth, Texas, and Linda K. Jenkins, Dallas, Texas, Attorneys for Appellants.

Bodoin, Burnside & Burge P.C., and Robert R. Bodoin and Mark Edwin Burge, Fort Worth, Texas, and Chris Harris and Associates, and Chris Harris, Arlington, Texas, Attorneys for Appellees.

PANEL A: DAY and LIVINGSTON, JJ.

## OPINION

DAY, Justice.

## INTRODUCTION

Appellees Steppes Apartments, Ltd. ("Steppes") and John L. Feece brought this declaratory judgment action against appellant Donald E. Armstrong, Trustee of the Donald E. Armstrong Family Trust and the Donald E. Armstrong Charitable Remainder Unitrust, for a declaration of whether Steppes was in default under loan documents securing the purchase of an apartment complex. After a non-jury trial, the trial court determined that Steppes was not in default and that Armstrong contracted for, charged, and received usurious interest in an amount more than double that allowed by law. The trial court ordered all principal and interest under the two notes forfeited, assessed fines of three times the amount of usurious interest, and awarded attorneys' fees.

Armstrong[1] raises 122 points on appeal. We affirm.[2]

## FACTUAL BACKGROUND

On September 29, 1994, Steppes entered into a sales agreement to purchase an apartment complex located in Fort Worth, Texas. The sellers, the Donald E. Armstrong Charitable Remainder Unitrust and the Donald E. Armstrong Family Trust, were represented by their trustee, Donald E. Armstrong. On September 29, 1994, Steppes executed two promissory notes: one in favor of the Unitrust in the original principal amount of $1,071,500 and one in favor of the Family Trust in the original principal amount of $375,250. Both notes were secured by deeds of trust. Steppes' president, John L. Feece, also executed a personal guaranty in favor of the trusts.

Both notes had a sliding interest scale. For the first 3 months, interest accrued at the rate of 2 percent. The interest rate rose by 2 percent every 3 months for the remainder of the first year. The interest rate was 8.5 percent during the second year, 9 percent during the third year, and 10 percent during the fourth through eleventh years. The notes provided for deferred down payments which were subject to a 9 percent interest rate. The notes also provided for a 13.5 percent per annum default interest rate and a 7 percent late charge.

1. All references to "Armstrong" are to Donald E. Armstrong, acting in his capacity as trustee of the Donald E. Armstrong Family Trust and the Donald E. Armstrong Charitable Remainder Unitrust.

2. In an unpublished opinion issued on August 20, 1998 in this appeal, we affirmed the trial court's judgment concerning the points raised by appellants Boy's Clubs of San Diego, Jennifer Potter, Jerry B. James, and National Ability Center.

On October 12, 1994, Armstrong demanded that the Steppes create impound or reserve accounts for the payment of taxes and insurance and proposed how he thought this should be done. Impound accounts had not been created prior to the closing; however, the deeds of trust provided that

[i]f requested by the Beneficiary at any time, Grantor shall pay to the Beneficiary on the first day of each month or at such other times as may be specified by Beneficiary such amounts as the Beneficiary may from time to time estimate to be necessary to create and maintain a reserve fund from which to pay, before the same become due, all taxes, assessments, liens and charges on or against the mortgaged property, and all premiums for insurance required hereunder.

Armstrong also sought reimbursement for the prepayment of utility bills, requested copies of insurance polices, and insisted that he be named individually, in addition to the two trusts, on the insurance policies.

On the same day, Armstrong sent Feece a fax asking Steppes to pay half of a revised bill from P.E. Pennington and Company that Armstrong received after closing. Armstrong also stated that he would just "keep" a $3,194 check from the City of Fort Worth Housing Authority for October rents and utilities that Feece had sent him to endorse and return. Armstrong explained that he estimated he was owed approximately $5,000 for pre-paid utilities in addition to rents prior to September 29. He credited Steppes $1,868 from the check toward utility payments.

Feece responded on October 18, 1994. He rejected Armstrong's proposed plan for reserve accounts, informed Armstrong that he had procured insurance for the apartment complex, and stated that, according to the deeds of trust, Steppes would pay 1/12th of the annual property taxes on a monthly basis. He also proposed an alternate plan for payment of those reserves. Feece claimed Steppes was not responsible for any additional P.E. Pennington and Company charges because those fees had been finally prorated prior to closing. Feece refused to unconditionally accept Armstrong's estimate of utility charges due. He also asked Armstrong to return $1,868 from the Housing Authority check because it was attributable to October rent and $88.40 which was the prorated amount of September rent owed to Steppes. Feece warned that if Steppes did not receive these amounts, Steppes would deduct them from the first note payment.

Armstrong deposited the Fort Worth Housing Authority check into his own account. Part of the check included monies attributable to after-closing rents due to Steppes. Armstrong deducted Steppes' share of the rents included in the check and applied it to utility bills. Armstrong was not aware of any document that authorized him to do so. The loan documents provided that Armstrong would be reimbursed for utility charges if, as, and when they were paid by the tenants. John Feece and his wife, Rosalie, testified that they sent Armstrong all monies he was ever due for utilities. Armstrong admitted that he received utility reimbursements, but he testified they were unacceptable to him.

In an October 25, 1994 letter, Armstrong rejected the Feeces' proposal concerning impound accounts. He told the Feeces that he was "going to get some lenders to provide me with information on how they begin impound accounts. I imagine they will require at least two months tax and insurance impounds in advance. I suggest you explore that yourself." He also said "The biggest issue for me is having me named individually as additional in-

sured.... The fact that you are not obligated to do that is not the issue."

In its first payment, which was due November 1, 1994, Steppes offset the amount of the Housing Authority check that Armstrong refused to return. Feece instructed Armstrong to credit the withheld monies to interest due under each note.

On November 1, 1994, the day the first payments were due under the notes, Armstrong declared Steppes in default on both notes and claimed to be entitled to the 13.5 per annum percent default interest rate. The bases for his default claim were that: (1) Steppes did not use its "best efforts" to reconcile utility charges due to the trusts; (2) Steppes did "not abid[e] by my requests on the tax and insurance impounds"; (3) Steppes did not provide Armstrong with copies of the insurance policies or proof of payment of the first year's insurance premium; and (4) the insurance policies contained incorrect additional insurance endorsements for the two trusts and did not name Armstrong individually as an additional insured. Armstrong gave Steppes ten days, or until November 11, to cure these defaults. Armstrong testified that as of November 1, he wanted 2 months' reserve for insurance and taxes.

Steppes attempted to cure. Feece paid Armstrong the full amount of the first payment due by November 3, 1994. Because Armstrong's demands concerning the insurance and tax reserve accounts and the prepaid utilities were inconsistent, the Feeces took Armstrong up on his suggestion that they calculate the amounts themselves. They calculated how much they thought Armstrong was entitled to and sent him checks for those amounts. Armstrong found that unacceptable. He explained "I cannot accept this check [for pre-paid utility reimbursements]. This situation is too complicated and I am concerned accepting or depositing this check

will confuse the default issues.... Please cure all the defaults or none."

Armstrong sent Steppes another letter on November 10 stating that the matters had not been cured and giving Steppes 24 hours to cure the alleged defaults and avoid acceleration of the debt. Armstrong continued to insist that he be named individually on the insurance policy as an additional insured and that Steppes pay the P.E. Pennington and Company bill and Armstrong's estimate of utility reimbursement charges before those funds were received by Steppes. Armstrong also stated he would be satisfied with a 1 month reserve fund because he had learned that federal law would not allow a 2 month reserve fund. At trial, Armstrong admitted that he knew neither the notes nor the deeds of trust authorized him to make some of the demands he made in the November 10th letter such as his demands for payment of the P.E. Pennington and Company bill, reimbursement of all utilities by November 11th, and payment of his attorneys' fees. Up until November 11, Armstrong never provided the Feeces with an amount they could pay to satisfy his demand for a reserve account even though the deeds of trust required him to do so, nor did he inform them of the other amounts he would accept to cure the alleged default.

Armstrong accelerated the amounts due under the notes on November 11, 1994 and claimed that the default interest rate of 13.5 percent per annum went into effect on that day. He did not inform the Feeces that he had accelerated, but at trial testified that he sent them notice of his intent to exercise the option to accelerate. He interpreted the deeds of trust as waiving notice of acceleration.

Steppes filed a declaratory judgment action on November 17, 1994, seeking a declaration of whether it was in default;

Armstrong filed a counterclaim, and Feece intervened.

Steppes paid Armstrong an $80,375 installment of deferred down payments on March 29, 1995. The Feeces testified that Steppes would not have made that payment if they had known Armstrong accelerated on November 11, 1994.

The Steppes Apartments were damaged by hail on May 5, 1995. The Feeces received the $158,000 insurance check in December 1995. They forwarded it to Armstrong because it was payable to the two trusts. The deeds of trust provided "[i]n case of loss, the beneficiary at its option shall be entitled to receive and retain the proceeds of the insurance policies, applying the same upon the indebtedness hereby secured." Armstrong refused to allow the Feeces to use the insurance proceeds to repair the apartments. Instead, Armstrong applied the insurance check the Feeces sent him to principal divided between the two notes. This was contrary to the Feeces' instructions to apply it to the larger note.

On June 6, 1995, Armstrong wrote to the Feeces that if he won in court, the entire balance "will" be due and payable immediately. Steppes made another $80,375 deferred principal payment on September 29, 1995.

Armstrong's attorney sent Steppes a default letter on October 6, 1995. He claimed the 13.5 percent default interest rate went into effect on November 1, 1994. He also demanded $125,000 for taxes and insurance.

On November 10, 1995, the trial court found Steppes in default and granted summary judgment in Armstrong's favor. Armstrong then posted the property for foreclosure and sought the appointment of a receiver.

The trial court granted Steppes' motion to reconsider, and set aside the summary judgment on December 20, 1995; Armstrong was enjoined from foreclosing. Before the summary judgment was set aside, however, Steppes' attorney contacted Armstrong's attorney and advised him of Steppes' ability to refinance the notes secured by the apartments. For the first time, Armstrong calculated the amount he claimed was due under the notes. On November 29, 1995, Armstrong's attorney communicated a demand for the 7 percent late charge that had been imposed on the entire unpaid principal balance on November 21, 1994. The next day, Armstrong's attorney showed Steppes' attorney Armstrong's payoff schedules. Steppes asked Armstrong to provide an accounting and payoff quote, but he refused.

On December 27, 1995, the trial court ordered Armstrong to produce his payoff quotation and schedules to explain how he calculated the unpaid balance. Armstrong responded by sending a letter offering to settle for $1.4 million. After a motion to compel and over his objections, Armstrong produced the payoff quotation on January 25, 1996. The payoff quotation calculated interest using the 13.5 percent per annum default interest rate from November 11, 1994. It also imposed the 7 percent late charge on the entire remaining balance on that date and compounded the late charge at the 13.5 percent per annum default interest rate.

After a bench trial, the trial court rendered judgment in favor of Steppes on its claims for double usury, assessed statutory penalties, voided the two notes, and awarded attorneys' fees to Steppes. It also entered a take-nothing judgment in favor of Steppes and Feece on all of Armstrong's claims.

## DEFAULT AND ACCELERATION

In thirty-three findings of fact and seven conclusions of law, the trial court determined that Steppes did not default on the notes and that the trusts were not entitled to accelerate the debt. In points 85 through 122, Armstrong challenges the legal and factual sufficiency of the findings and conclusions regarding default and acceleration.

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *See Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex.1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994).

If an appellant is attacking the legal sufficiency of an adverse answer to an issue on which he had the burden of proof, the appellant must overcome two hurdles. *See Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 940 (Tex.1991). First, the record must be examined for evidence that supports the finding, while ignoring all evidence to the contrary. Second, if there is no evidence to support the finding, then the entire record must be examined to see if the contrary proposition is established as a matter of law. *See id.; Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989).

In reviewing a point asserting that an answer is "against the great weight and preponderance" of the evidence, we must consider and weigh all of the evidence, both the evidence that tends to prove the existence of a vital fact as well as evidence that tends to disprove its existence. *See Ames v. Ames*, 776 S.W.2d 154, 158–59 (Tex.1989), *cert. denied*, 494 U.S. 1080, 110 S.Ct. 1809, 108 L.Ed.2d 939 (1990); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). So considering the evidence, if a finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained, regardless of whether there is some evidence to support it. *See Watson v. Prewitt*, 159 Tex. 305, 320 S.W.2d 815, 816 (1959); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). Conclusions of law may not be challenged for factual sufficiency, but they may be reviewed to determine their correctness based upon the facts. *See Forbis v. Trinity Universal Ins. Co.*, 833 S.W.2d 316, 319 (Tex.App.—Fort Worth 1992, writ dism'd).

During trial, Armstrong's stated reasons for default dwindled to four: Steppes' alleged failure to provide Armstrong with proof of payment or financing for the first year's insurance premiums; Steppes' failure to abide by Armstrong's demands concerning impound accounts for taxes and insurance; insurance policy irregularities including a misspelling of the named insured apartment complex, a policy that purported to cover only 3 months, and the failure to name Donald E. Armstrong individually as an insured; and Steppes' failure to provide Armstrong with complete copies of the insurance policies. Armstrong agreed at trial that all of the reasons he asserted for default were for small items.

The trial evidence showed that Steppes paid Armstrong 1/11th of the estimated annual taxes and insurance due each month so that an extra month's payment would accumulate by the end of the eleventh month, but Armstrong refused to use that money to buy insurance and continued to insist that Steppes pay him a 2–year advance for insurance. Steppes also sent

him all of the money necessary to pay taxes before they became due. Armstrong never returned any of the checks the Feeces sent him for insurance or taxes, nor did he notify them of any impound accounts he created for those funds.

The evidence also showed that the Steppes Apartments were fully insured at all times by the Feeces; that, assuming no default, Steppes timely made all payments and paid all insurance and taxes; that the two trusts were always named as additional insureds; that the misspelling had no effect on coverage, that the misspelling was corrected, and that the Feeces mailed Armstrong copies of the insurance policies as soon as they received them. The notes gave Steppes the option of providing Armstrong with either copies of the insurance policies or certificates of insurance, and Armstrong admitted that he received insurance binders and certificates of insurance. The deeds of trust did not require insurance policies that covered an entire year and insurance binders delivered at closing typically cover only 3 months, as did the binders in this case. Armstrong admitted that he was not authorized to declare default based on Steppes' failure to provide him with copies of the first year's insurance policies. The notes and deeds of trust did not require Steppes to list Armstrong individually as a named insured on the insurance policies and Armstrong admitted that he was not entitled to be listed individually as a named insured.

The trial court found that Steppes substantially performed its obligations under the notes and deeds of trust, cured any alleged default, and substantially complied with Armstrong's demands. It also concluded that Steppes was not in default and Armstrong was not entitled to accelerate. The evidence is legally and factually sufficient to support the trial court's findings of fact and conclusions of law concerning de-

fault and acceleration. We overrule points 85 through 122.

## USURY

A lender commits usury if it contracts for, charges, or receives interest greater than the maximum amount allowed by law. TEX.REV.CIV.STAT.ANN. art. 5069–1.06 (Vernon 1987) (Act of May 23, 1967, 60th Leg., R.S., ch. 274, 1967 Tex.Gen. Laws 608, 610 (repealed 1997)) (current version at TEX. FIN.CODE ANN. § 305.001 (Vernon Supp. 2001)). In 14 findings of fact and five conclusions of law, the trial court determined that Armstrong contracted for, charged, and received a usurious amount of interest and that the interest charged was in excess of double the amount authorized by law. Armstrong challenges those findings and conclusions in points 21 through 79.

### *Sufficiency of the Evidence*

■ Armstrong asserts that the evidence is legally and factually insufficient to support the trial court's findings of fact and conclusions of law concerning usury and the amount of usury damages awarded in the judgment.

Armstrong presented the testimony of usury expert Frank St. Claire. St. Claire is an MIT graduate who formerly worked as an actuary. He is a partner with Strasburger & Price and has practiced commercial real estate law for the last 21 years. He is also the author of several frequently-cited law review articles on the subject of usury and has spoken and published other papers about usury.

St. Claire testified that the 7 percent late charge on the accelerated or matured loan balance was imposed automatically. The payoff quotation and schedules Armstrong prepared show the imposition of the 7 percent late charge, in the amount of $101,417.71, on the entire principal balance

of the notes as of November 21, 1994. Armstrong added the amount of the late charge to the remaining balance, which he calculated as subject to the 13.5 percent default interest rate, and compounded the interest on the amount of both the remaining balance and the late charge. St. Claire admitted that without the savings clause, the notes are usurious. St. Claire calculated that $23,132.76 was the maximum lawful amount Armstrong could have charged as a late charge. St. Claire acknowledged that Armstrong's payoff quote charged a $101,417.71 late charge.

Charging the 7 percent late charge in addition to the 13.5 percent interest rate imposed by acceleration results in a 20.5 percent interest rate, which is greater than the maximum 18 percent interest rate allowed by law. *See Dixon v. Brooks,* 678 S.W.2d 728, 731 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) (Late charges fall into the category of a contingent additional charge which are treated as interest and added to the interest contracted for.). And, according to Armstrong's own expert, without the savings clause Armstrong charged more than three times as much as allowed by law. Taking various offsets into consideration, the trial court used a figure slightly less than the difference between what Armstrong charged and what St. Claire testified was the legal maximum amount that could have been charged to determine the amount of damages awarded representing three times the amount of usurious interest contracted for, charged, or received under both notes. *See* Tex. Rev.Civ.Stat.Ann. art. 5069–1.06(1), (2) (repealed 1997, current version at Tex.Fin. Code Ann. §§ 305.001, .002 (Vernon Supp. 2001)). We hold the evidence legally and factually sufficient to support the trial court's findings of fact, conclusions of law, and damages award. Furthermore, under these facts it was unnecessary for the trial

court to include mathematical calculations to support its findings.

### Savings Clause

Armstrong asserts that the trial court's usury findings and conclusions were erroneous because the savings clauses in the deeds of trust lower all interest to a non-usurious level and, as a result, there is no evidence of usury. Armstrong's usury expert, Frank St. Claire, explained that a usury savings clause "basically evidences the intent of the parties to comply with the Texas usury laws." According to St. Claire, a usury savings clause places a mandatory, overall ceiling on any calculated usurious amount to automatically reduce it to an amount that does not exceed the maximum non-usurious interest rate. St. Claire agreed that without the savings clauses, the notes were usurious.

Texas courts have acknowledged the validity of usury savings clauses and, in appropriate circumstances, enforced such clauses to defeat a violation of the usury laws. *See Woodcrest Assocs., Ltd. v. Commonwealth Mortg. Corp.,* 775 S.W.2d 434, 437 (Tex.App.—Dallas 1989, writ denied). The mere presence of a usury savings clause, however, will not rescue a transaction that is necessarily usurious by its explicit terms. *Id.* at 438. The effect of a usury savings clause in a particular case is largely a question of construing the terms of the savings clause as a whole and in light of the circumstances surrounding the transaction. *Id.*

The deeds of trust in this case contained identical savings clauses:

If, from any circumstance whatever, fulfillment of any provision of this Deed of Trust, at the time performance of such a provision shall be due, shall involve exceeding the limit of validity prescribed by the usury statute or any other law, then, the obligation to be fulfilled shall

be reduced to the limit of such validity, so that in no event shall any exaction be possible under this Deed of Trust, or any note or notes representing the indebtedness secured hereby, that is in excess of the limit of such validity.

In no event shall the Grantor be bound to pay for the use, forbearance or detention of money loaned and secured hereby interest in excess of the highest lawful rate; the right to demand any such excess shall be and is hereby waived, and this provision shall control every other provision of this Deed of Trust.

■ The savings clause does not rescue Armstrong for two reasons. First, the notes are usurious on their faces. A savings clause is ineffective if it is directly contrary to the explicit terms of the contract. *See First State Bank v. Dorst,* 843 S.W.2d 790, 793 (Tex.App.—Austin 1992, writ denied). A lender cannot avoid the consequences of contracting for a usurious interest rate simply by including a savings clause in the contract. *See id.* Second, there is no evidence in the record that Armstrong ever attempted to effectuate the savings clause. Consequently, he cannot now seek its protection in this appeal. *See Victoria Bank & Trust Co. v. Brady,* 779 S.W.2d 893, 901 (Tex.App.—Corpus Christi 1989), *rev'd in part on other grounds,* 811 S.W.2d 931 (Tex.1991).

### Spreading Doctrine

■ Armstrong asserts that the trial court abused its discretion because it did not apply the spreading doctrine to defeat Steppes' usury claims. All parties agree that if the interest charged by Armstrong

were spread over the 11 year term of the notes, it would not be usurious. Conversely, all parties agree that if the applicable term is 54 days, which is the time from the date of closing until Armstrong's acceleration of the notes, the interest rate exceeds the double usury rate.

The Texas Supreme Court has established that contracts are tested for usury by spreading the interest over the entire term of the contract. *See Tanner Dev. Co. v. Ferguson,* 561 S.W.2d 777, 786 (Tex. 1977). Similarly, article 5069–1.07(a) also provides for spreading of interest to determine whether a loan secured by real property is usurious. *See* Tex.Rev.Civ.Stat. Ann. art. 5069–1.07(a) (Vernon 1987) (Act of March 12, 1975, 64th Leg., R.S., ch. 26, § 1, 1975 Tex. Gen. Laws 47, 47, *repealed by* Act of May 22, 1997, 75th Leg., R.S., ch. 1008, § 1, 1997 Tex.Gen. Laws 3091, 3422) (current version at Tex.Fin.Code Ann. § 302.101(a) (Vernon Supp.2001)).[3]

The most frequently-cited definition of spreading is that provided by Armstrong's usury expert, Frank A. St. Claire:

"Spreading" can best be defined as a method of allocating over the life of a loan (*or a portion of the loan, in the event the loan maturity is accelerated or the loan is prepaid*) charges that the parties themselves have called interest or that a court would deem interest regardless of the label given the charge by the parties. [emphasis added]

Frank A. St. Claire & Sara Greenwood Hogan, *The Revised Texas Usury Ceilings—a New Alice in Wonderland,* 14 St. Mary's L.J. 187, 246 (1983); Frank A. St. Claire, *The Spreading of Interest Under the Actuarial Method,* 10 St. Mary's L.J.

3. "[D]etermination of the rate of interest for the purpose of determining whether the loan is usurious under all applicable Texas laws shall be made by amortizing, prorating, allocating, and spreading, in equal parts during the period of the full stated term of the loan, all interest at any time contracted for, charged, or received from the borrower in connection with the loan."

753, 755 n. 10 (1979). Thus, when a note is accelerated the term of the loan is shortened and, in this case, that means that the interest charged by Armstrong was to be spread over 54 days. As a result, the interest was usurious.

### Court-ordered Disclosures

Armstrong asserts that the trial court erred by forcing him to disclose his payoff quote and schedules which included the 7 percent late charge. Armstrong argues that because he produced these calculations pursuant to court order, they are part of the judicial process and cannot constitute a charge of usurious interest. Without those calculations, Armstrong claims there is no evidence of usury.

Armstrong waived these arguments, however, because he offered the payoff quote and schedules into evidence. He cannot now argue that the trial court should not have considered that evidence which he himself introduced at trial. *See Texas Dep't of Transp. v. Olson,* 980 S.W.2d 890, 898 (Tex.App.—Fort Worth 1998, no pet.).

Armstrong also asserts that his constitutional rights to be free from self-incrimination and unreasonable search and seizure were violated because the trial court ordered him to produce the payoff quote and schedules. To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion. *See* Tex.R.App.P. 33.1(a); *see also* Tex.R.Evid. 103(a)(1). If a party fails to do this, error is not preserved, and the complaint is waived. *See Bushell v. Dean,* 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g). Armstrong did not raise any of these complaints in the trial court. Consequently, they are waived.

Armstrong initially responded to the trial court's order to produce his payoff quote by sending Steppes a letter on January 15, 1996 in which Armstrong made a $1.4 million demand on the notes. The demand includes "a one-time late fee of 7%, calculated based upon the outstanding principal amount that was due on November 21, 1994." Armstrong argues that the trial court erred in admitting his January 15, 1996 letter because he claims it was inadmissible as a settlement proposal under Rule of Evidence 408. Tex.R.Evid. 408. Armstrong did not object to admission of the letter and, as a result, has waived any complaint on appeal. *See* Tex.R.App.P. 33.1; *Bushell,* 803 S.W.2d at 712.

### Effect of Codification

Armstrong asserts that the 1997 codification of Texas' usury laws had the effect of deleting the forfeiture and double usury penalties and that these alleged amendments should be applied retroactively. He is mistaken. There were no substantive changes made to the relevant portions of the usury statute and the current finance code contains both a forfeiture penalty and a penalty for double usury. *See* Tex.Fin. Code Ann. §§ 305.001, .002.

### Equity

■ Armstrong also makes a general plea for equity. He claims that the court-ordered disclosure of the amount he would accept to defeat foreclosure led to the usury claims. Armstrong cannot avail himself of equity protections, however, because he has not acted equitably himself. *See Breaux v. Allied Bank of Texas,* 699 S.W.2d 599, 604 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.), *cert. denied,* 479 U.S. 1002, 107 S.Ct. 638, 93 L.Ed.2d 695 (1986). Armstrong covertly accelerated the notes, but took action inconsistent with acceleration because he continued to

accept monthly payments and other monies from Steppes and Feece. Armstrong also sought judicial foreclosure of the Steppes Apartments, but refused at all times to tell Feece how much was required to avoid foreclosure and finally only did so over objection pursuant to court order. Under these circumstances, general principles of equity do not operate to rescue him from the consequences of contracting for or charging usurious interest.

### *Damages*

In points 80 through 83, Armstrong argues that the amount of the usury penalties imposed on the two trusts violates Texas Civil Practice and Remedies Code section 41.008's punitive damages cap and his constitutional rights to be free from excessive fines and to due process. TEX. CIV.PRAC. & REM.CODE ANN. § 41.008 (Vernon 1997). Armstrong failed to raise these arguments in the trial court; therefore, they are waived.

We overrule points 21 through 83.

### GUARANTY

John L. Feece executed a personal guaranty at the same time the notes and deeds of trust were executed. The guaranty contained a forum selection clause designating California as the forum for any litigation arising from the guaranty. Armstrong sought a declaration in this case that Feece was liable on the guaranty, and Feece countersued for a finding to the contrary and for usury. Armstrong subsequently sued Feece in California on the guaranty. The trial court in the instant case rendered a take-nothing judgment in favor of Feece on the personal guaranty and permanently restrained and enjoined Armstrong from pursuing the California litigation. In points 1 through 20, Armstrong complains about the trial court's

findings, conclusions, and judgment concerning the guaranty.

In his first four points, Armstrong seems to argue that regardless of our disposition concerning the notes and deeds of trust, he should prevail on his guaranty-based claims against Feece. Feece's obligations under the guaranty were contingent on a breach or default under the notes or deeds of trust. The trial court found that Armstrong was not entitled to declare a default because Steppes substantially performed its obligations under the notes and deeds of trust. Therefore, if there were no default, Feece could not have been liable under his personal guaranty. We overrule points 1 through 4.

Points 5 through 20 challenge the trial court's anti-suit injunction permanently restraining and enjoining Armstrong from pursuing litigation in California or elsewhere based on the notes, deeds of trust, or guaranty. A trial court's issuance of an anti-suit injunction is reviewed under an abuse of discretion standard. *See Forum Ins. Co. v. Bristol–Myers Squibb Co.*, 929 S.W.2d 114, 117 (Tex. App.—Beaumont 1996, writ denied). "An anti-suit injunction is appropriate in four instances: (1) to address a threat to the court's jurisdiction; (2) to prevent the evasion of important public policy; (3) to prevent a multiplicity of suits; or (4) to protect a party from vexatious or harassing litigation." *Golden Rule Ins. Co. v. Harper*, 925 S.W.2d 649, 651 (Tex.1996). The trial court in this case found that the anti-suit injunction was necessary based on all four of the *Golden Rule* factors. It also found that Feece would be irreparably harmed by additional legal action and have no adequate remedy at law.

Generally, if a cause of action could be filed in either of two courts, the first court acquiring jurisdiction will retain

jurisdiction. *See Gurvich v. Tyree*, 694 S.W.2d 39, 43 (Tex.App.—Corpus Christi 1985, no writ). The underlying lawsuit was filed first and neither party disputes that the Texas court had jurisdiction over the guaranty issues. Armstrong subsequently filed the California lawsuit with allegations identical to those pending before the Texas court. Armstrong later transferred the two notes to two newly-created entities that he controlled and placed those entities into Chapter 11 bankruptcy. He then removed this case to federal court and sought a transfer to the Utah bankruptcy court. Steppes obtained relief from the automatic stay and dismissal of the two bankruptcies. The Texas federal court then remanded this case back to state court, stating that although "[Armstrong] may believe that he has been treated unfairly in state court, the remedy lies through the appellate process, and not through any attempt to fraudulently create jurisdiction in another court."

We conclude that Armstrong's abuse of the Texas, California, and Utah courts was done in an effort to evade or destroy the Texas state court's jurisdiction, was contrary to Texas public policy, would have resulted in a multiplicity of lawsuits, was vexatious and harassing, and threatened Feece with irreparable harm for which there was no adequate legal remedy. The trial court did not abuse its discretion in issuing the anti-suit injunction. We overrule points 5 through 20.

### ATTORNEYS' FEES

The trial court awarded Steppes $435,301.90 as reasonable and necessary attorneys' fees for services rendered through trial. It also awarded provisional attorneys' fees for appeal. In point 84, Armstrong argues that the trial court abused its discretion by awarding unreasonable and excessive attorneys' fees.

We review a trial court's attorneys' fees award under an abuse of discretion standard. *See USX Corp. v. Union Pacific Resources Co.*, 753 S.W.2d 845, 857 (Tex.App.—Fort Worth 1988, no writ). Factors to consider in determining a reasonable attorneys' fee are: the time and labor required; the novelty and difficulty of the questions involved; the skill needed to do the work properly; the preclusion of other employment; the fee customarily charged; the amount at issue and the results obtained; the time limits imposed by the client or circumstances; the nature and length of the relationship with the client; and the experience, reputation, and ability of the attorney doing the work. *See MCI Telecommunications Corp. v. Crowley*, 899 S.W.2d 399, 403 (Tex.App.—Fort Worth 1995, orig. proceeding).

By agreement, the parties below submitted their attorneys' fee evidence by affidavit. Steppes submitted an independent expert affidavit in addition to the affidavits of two of its trial counsel. Armstrong's complaint on appeal is that the affidavits of the two trial counsel did not breakdown the number of hours spent on the case. The expert's affidavit, however, stated that he based his opinion on the hours spent on the case, the nature of the case preparation, the complexity of the case, the trial attorneys' experience, and the prevailing hourly rate. Furthermore, the trial court may take judicial notice of the usual and customary attorneys' fees and of the contents of the case file in making its attorneys' fee award. *See* TEX.CIV.PRAC. & REM. CODE ANN. § 38.004 (Vernon 1997); *Matelski v. Matelski*, 840 S.W.2d 124, 130 (Tex. App.—Fort Worth 1992, no writ). We hold that the trial court did not abuse its discretion because the attorneys' fees were reasonable and necessary. We overrule point 84.

## CONCLUSION

Because we have found no trial court error and have overruled all 122 of Armstrong's points, we affirm the trial court's judgment.