# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00077-CV

**J. Stephen Spencer and Kippling L. Spencer, Appellants**

**v.**

**Noel Douglas Vaughn, Catherine Gay Vaughn and Scott Alan Yeats, Appellees**

### FROM THE DISTRICT COURT OF HAYS COUNTY, 274TH JUDICIAL DISTRICT
### NO. 2003-0161, HONORABLE DON B. MORGAN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellants J. Stephen Spencer and Kippling L. Spencer appeal from the trial court's orders, entered after a jury trial, granting appellees Noel Douglas Vaughn and Catherine Gay Vaughn, Kippling Spencer's parents, access to their grandchildren M.N.Y. and S.N.S. They argue that the grandparent visitation statute then in effect is unconstitutional on its face and as applied to them. They further argue that it was an abuse of discretion to modify M.N.Y.'s conservatorship and to award $100,000 in attorney's fees. We affirm the trial court's orders.

### Factual and procedural background

M.N.Y. was born in December 1994, and S.N.S. was born in August 1997. Mrs. Spencer is the mother of both children. Appellee Scott Alan Yeats is M.N.Y.'s biological father. Mr. Yeats and Mrs. Spencer were divorced in early 1996, and Mrs. Spencer was appointed sole managing conservator of M.N.Y., while Mr. Yeats was named possessory conservator and given

weekend and summer visitation consistent with the family code. *See* Tex. Fam. Code Ann. §§ 153.312 (West Supp. 2007), .313 (West 2002). After the divorce, Mrs. Spencer and M.N.Y. lived with the Vaughns for a while before she married Mr. Spencer in July 1996. Mr. Spencer is S.N.S.'s biological father and M.N.Y.'s stepfather.

Relations between the Vaughns and their daughter soured after her marriage to Mr. Spencer, and in 1998, the Vaughns sued for grandparent access under former sections 153.432 and 153.433 of the family code. *See* Act of May 27, 2005, 79th Leg., R.S., ch. 484, §§ 3, 4, 2005 Tex. Gen. Laws 1345, 1345-46 (amending sections 153.432 and 153.433; current versions at Tex. Fam. Code Ann. §§ 153.432, .433 (West Supp. 2007)).[1] The Spencers and the Vaughns settled their dispute, and on August 20, 1998, the trial court signed an order agreed to by the Spencers, the Vaughns, and Mr. Yeats. Under the agreed order, the Vaughns were given access to the children as follows: for the first six months, the Vaughns were granted one full day of visitation with M.N.Y. each month, the first three hours of which were to occur in the Spencers' home and were to overlap with the Vaughns' visitation with S.N.S., with whom they also had another half-day of separate and in-home visitation later in the month. After six months, the Vaughns were to have one full day with both children once a month and two forty-eight-hour periods each year with thirty days' notice to the Spencers, provided that the two-day visits did not conflict with the Spencers' plans or Mr. Yeats's visitation with M.N.Y. If the Vaughns' proposed forty-eight hours conflicted with existing plans, the Spencers were to notify the Vaughns within five days and seek a substitute period. The Vaughns

---

[1] The 2005 amendments do not apply to this case. *See* Act of May 27, 2005, 79th Leg., R.S., ch. 484, § 7, 2005 Tex. Gen. Laws 1345, 1346.

were to reimburse the Spencers $211 in court costs and were ordered to "allow" the Spencers to retrieve a television set, two bicycles, and any other property that was in the Vaughns' possession. The parties agreed to enter into a confidentiality agreement and to notify each other sixty days before any intended change of address or, if such notice was impossible, soon after learning of the change.[2] At the time the order was signed, the Spencers, the Vaughns, and Mr. Yeats all lived in Texas. At the time of trial, the Spencers lived in Dripping Springs, the Vaughns lived in Corpus Christi, and Mr. Yeats had remarried and lived in League City.

Very soon after signing the agreed visitation order, the Spencers moved to Utah without informing the Vaughns, who learned of the move when they arrived for their first visitation under the order. Mrs. Vaughn testified that the Spencers did not provide a mailing address until October 26, 1998, when Mr. Spencer provided a post office box address in Roy, Utah. The Spencers did not provide a phone number or physical address, and the Vaughns tried unsuccessfully to find a phone number for the Spencers in Roy. In July 1999, Mr. Spencer informed the Vaughns that "our family's physical address is: 203 North 1600 West," but did not provide a city, state, or zip code.

---

[2] The agreed order states:

> EACH PERSON . . . IS ORDERED TO NOTIFY EACH OTHER PARTY WITHIN 10 DAYS AFTER THE DATE OF ANY CHANGE . . . . THE PARTY IS ORDERED TO GIVE NOTICE OF AN INTENDED CHANGE . . . ON OR BEFORE THE 60TH DAY BEFORE THE INTENDED CHANGE. IF THE PARTY DOES NOT KNOW OR COULD NOT HAVE KNOWN OF THE CHANGE IN SUFFICIENT TIME TO PROVIDE 60-DAY NOTICE, THE PARTY IS ORDERED TO GIVE NOTICE OF THE CHANGE ON OR BEFORE THE FIFTH DAY AFTER THE DATE THAT THE PARTY KNOWS OF THE CHANGE.

A letter sent to that address in Roy was returned, stamped, "No such address." In affidavits signed in March 2003, the Spencers stated that their physical address had been in West Point, Utah.

Mr. Yeats testified that on August 27, 1998, one week after the trial court signed the agreed order, the Spencers informed him that they were moving to Utah in three days. Mr. Yeats visited M.N.Y. in Utah in September and testified that the Spencers threatened several times to move and not tell him where they lived if he told anyone their address. Mr. Spencer told Mr. Yeats that they had moved to Utah to get away from the Vaughns.

Mr. Spencer wrote the Vaughns several letters in 1998 and 1999 complaining that the Vaughns had not returned the Spencers' property and were obligated to ship the property to the Spencers in Utah, had failed to pay $211 in court costs,[3] and had breached the confidentiality agreement. Mrs. Vaughn testified that the agreed order required the Vaughns to allow the Spencers to pick up their property, but that the Spencers never did so and that the items were still in the Vaughns' possession. In May 1999, Mr. Spencer wrote again, stating that because the Vaughns had not paid the court costs or shipped the Spencers' property, they were barred from contacting, visiting, or "attempt[ing] to carry on a relationship" with the children.

In early August 1999, the Vaughns sent the Spencers a letter providing thirty days' notice that they intended to exercise their visitation rights by coming to Utah for a weekend in

---

[3] Mrs. Vaughn testified that she wrote a check shortly after the agreed order was signed and gave it to Duncan Neblett, their attorney, believing he would transmit it to the Spencers. In June 1999, Mrs. Vaughn wrote to Neblett, stating that she had sent him a check for $166, which she realized should have been for $211, and that although she thought he would forward it to the Spencers, it had not been cashed. In March 2003, the Vaughns' new attorney, Henry Bell, wrote a letter to the Spencers' attorney, explaining that Neblett failed to send the Vaughns' check to the Spencers. Bell enclosed a check for $211, but Mrs. Vaughn did not think it had been cashed.

4

September 1999.  This letter was sent by certified and regular mail to the Spencers' post office box in Roy, Utah, and the certified letter was returned to the Vaughns as unclaimed. On August 27, 1999, Mr. Spencer wrote the Vaughns, stating that the Spencers had not received the Vaughns' letter until August 27 because the Spencers had been out of town.  Mr. Spencer said they had other plans for the weekend proposed by the Vaughns but did not propose alternative dates. Mr. Spencer also said that because the Vaughns had not complied with the agreed order's visitation schedule for the first six months following its issuance, the Vaughns were "not entitled to see" the children.

The Spencers returned to Texas in late 1999 or early 2000, but the Vaughns did not learn of the Spencers' new address until several years later.  Mr. Yeats testified that although he knew the Spencers had moved back to Texas, they did not provide him with a new physical address until late 2002.  Mr. Yeats thought the Vaughns learned that the Spencers had returned to Texas when the Spencers sued Mr. Yeats for increased child support in early January 2003.  In January 2003, the Vaughns wrote the Spencers that they intended to begin weekend visitation in accordance with the agreed order in February but stated that if the planned weekend was inconvenient, they would come another Saturday.  The Spencers apparently informed the Vaughns that the proposed date conflicted with M.N.Y.'s plans, and in mid-February 2003, the Vaughns wrote again, pointing out that the Spencers had not provided an alternative date for visitation and saying that they would visit S.N.S. alone in February and would visit both girls on March 8. The Vaughns stated that they were not required to give notice before exercising their day visitations and that they intended to visit the girls every second Saturday as provided in the agreed order.

Mrs. Spencer replied that the Vaughns had provided "deficient" notice of their planned visit and that the March date conflicted with Mr. Yeats's visitation. Therefore, she concluded, the visitations were "excluded."

In March 2003, the Spencers filed a petition seeking to modify and vacate the agreed order, alleging that the Vaughns were harassing them and demanding access to the children in violation of the order and had violated provisions related to confidentiality and Mrs. Vaughn's mother. The Vaughns filed a motion for contempt, and the Spencers responded with a motion for contempt against the Vaughns. The Vaughns also sued for interference with their possessory rights to the children. Meanwhile, Mr. Yeats filed a petition seeking to be named M.N.Y.'s sole managing conservator and suing for interference with his possessory interest, asking to consolidate all the motions to modify. Mr. Yeats and Mrs. Spencer eventually agreed that they should be named joint managing conservators of M.N.Y., but disagreed about M.N.Y.'s primary place of residence.

At trial, Mrs. Vaughn testified that she and her husband never saw the children from the date of the agreed order in late August 1998 until June 2003. Mrs. Vaughn testified that it was in the children's best interests for her and Mr. Vaughn to have visitation so the girls could build relationships with their grandparents and their extended family. She testified that she and her husband had paid their current attorney about $43,000 and that they still owed about $40,000 for fees incurred leading up to the trial.

Sandra Perrenot, Mrs. Vaughn's sister and Mrs. Spencer's aunt, testified that her grandchildren spent a good deal of time at the Vaughns' house and that the Vaughns were very good with the children. She thought it was in M.N.Y.'s and S.N.S.'s best interest to have contact with

6

their grandparents because the Vaughns can "teach them so much" and "show them so much different kind of love a parent can't show them." She did not think it was in M.N.Y.'s best interest to stay with the Spencers and testified that shortly after S.N.S.'s birth in 1997, Mr. Spencer showed her a framed and "frontal nude" photograph of three-year-old M.N.Y., "standing there stark naked." Mrs. Perrenot said she was "appalled" but did nothing because she "didn't know what to say."

Stacey Gurleski, Mrs. Vaughn's niece and the Vaughns' next-door neighbor, testified that her daughter, who is the same age as S.N.S., loved the Vaughns, and that she allowed her daughter to walk to the Vaughns' house "all the time." She said the Vaughns are "very loving and nurturing and supportive people" and could not imagine her daughter "not having them in her life." She testified that when she went through chemotherapy while her husband was traveling, her daughter spent most of her time with the Vaughns. Mrs. Gurleski was very close to Mrs. Spencer growing up, but since the Spencers married, she has had almost no contact with Mrs. Spencer.

Mr. Yeats testified about difficulties he had with the Spencers related to visitation and M.N.Y.'s health insurance. He testified that in the summer of 2002, he agreed to delay the beginning of his forty-day summer visitation with M.N.Y. because the Spencers said they were taking the girls to Disney World. However, the Spencers postponed the trip without telling Mr. Yeats and later tried to delay his visit further because they wanted to take the girls to New Mexico. Mr. Yeats objected and insisted on having M.N.Y. for the remaining seven days of visitation, and he said that it was at that point that things got "really nasty." Mr. Yeats also testified that the Spencers sometimes told M.N.Y. that he was supposed to pick her up earlier than had been arranged in order to make her think he was late. On several occasions, he told the Spencers about plans he had made to take M.N.Y. to

7

sporting events or concerts, only to have the Spencers tell him there was a conflict just before the event or to simply be away from home when he arrived to pick her up.

Mr. Yeats further testified that the Spencers never sent him copies he requested of M.N.Y.'s report cards and that he believed many of the gifts he gave M.N.Y. had been given away or returned. Mr. Yeats testified that although M.N.Y.'s last name is Yeats, he has learned that the Spencers taught M.N.Y. that her last name was Spencer "from the time when she was little" and used Spencer as her last name on medical bills and school enrollment forms. Mr. Yeats provided the school with M.N.Y.'s birth certificate, and as a result, her last name has been corrected and he is finally receiving her report cards from the school. Mr. Yeats also discovered that the Spencers had filed an affidavit with the school saying that it was against their religion for M.N.Y. to be immunized. The Spencers said they were afraid the shots would endanger M.N.Y. but never gave Mr. Yeats the names of any doctors they had consulted or any medical reports. He testified that he was concerned when the Spencers did not arrange for M.N.Y. to get timely vaccinations, including a tetanus shot; that there had been problems with M.N.Y. not getting proper dental care until he took her to a dentist during a visitation; and that the Spencers allowed her to drink too much caffeinated soda, which he believed interfered with her sleep. He testified that M.N.Y. was tall for her age and worried about her weight. He believed he could help with her body image issues because he has dealt with the same problems.

Mr. Yeats testified that he had allowed the Spencers to play games with him for years because M.N.Y. was unaware of the turmoil between her parents. Now, however, "it's getting to where it's affecting family life and . . . it's affecting her other ways that you can't even name." He

8

said he was seeking to change M.N.Y.'s living arrangements because "I have to save my kid."  Mr. Yeats testified that he was "very much in favor" of allowing the Vaughns to have contact with M.N.Y., saying he believed that it was "crucial" for her to have a relationship with the Vaughns and her extended family.  He testified that the Vaughn family was very close and supportive and that he did not believe the visitation should be terminated, saying, "[I]f anything, they should get more visitation than they already ordered."

Social worker Carol Robison testified about a home study she prepared for this case in 2004, and the Vaughns introduced her report into evidence.  Ms. Robison stated in her report that Mr. Yeats and the Vaughns were cooperative, provided the information she requested, and seemed to "truly have the 'best interest' of the children at heart."  The Spencers, however, did not provide information until ordered to do so and, although they "wished to portray themselves as being the only ones . . . that wished to fully cooperate with the Court and this investigator, they were indeed the only ones that did not want to provide information requested."  In one instance, the Spencers told Ms. Robison that they had mailed certain forms and documents months before they were ordered to provide the information, but Ms. Robison noted that the forms provided by the Spencers upon a court order were originals, saying, "The couple stated that they were copies, but they are not photocopied documents and are originals filled out in ink.  The information contained in them, such as ages, would also indicate that they were not completed in the spring and mailed, as the couple has so alleged."  Ms. Robison also testified that Mr. Spencer was reluctant to provide documentation about his military career and told Ms. Robison that his military records were sealed and that she "was not to release that to anyone," making that a condition of providing her the records.  Ms. Robison

observed in her report, however, that none of the documents he provided indicated that the records were sealed.

Ms. Robison said that the children were in good physical health but that M.N.Y. was very sensitive, appeared to be "under a great deal of stress and pressure," had been inappropriately informed of and involved in the legal proceedings, and was depressed as a result of her knowledge of the case. Ms. Robison believed the Spencers have involved M.N.Y. in their battles with Mr. Yeats and the Vaughns and reported, "It is strongly felt that Mr. Spencer has been greatly responsible for the decline in the relationships between [Mrs. Spencer] and her parents as well as between [Mrs. Spencer] and [Mr. Yeats]. . . . It is apparent that [Mr. Spencer] has total disregard for the Yeats and the Vaughns and it is perceived that [M.N.Y.] has been influenced by her step-father's attitude toward them." Mrs. Spencer discussed allegations about Mr. Spencer bathing with the girls and told Ms. Robison that Child Protective Services had instructed the Spencers not to bathe with the girls. Although Ms. Robison had not seen the nude photograph of M.N.Y., she testified that Mrs. Perrenot's description made the photo sound "very inappropriate" and raised a "red flag."

Ms. Robison testified that M.N.Y. and S.N.S. are very close and that she thought it was in their best interest to stay together. If splitting the children was not an issue, however, Ms. Robison testified that she would recommend that M.N.Y. live with her father. She said the Vaughns are "very kind, gracious, obviously have a deep concern for the welfare of their grandchildren" and she felt "strongly" that the children should have visitation with the Vaughns and their extended family at the Vaughns' home.

Mr. Spencer testified that he has not allowed the Vaughns to see the girls because "Mrs. Vaughn is so violently opposed to my marriage to Kippling she's been a horrible influence on

10

the girls when they have been around them." He testified that the Vaughns had been very controlling of Mrs. Spencer before the Spencers' marriage and that they sued for visitation because the Spencers decided to move away from the Vaughns. He said he did not control his wife and never asked her to choose between him and her family.

Mr. Spencer disputed Mrs. Perrenot's testimony about the picture of M.N.Y., calling Mrs. Perrenot a "liar." He testified that the photo was unframed and had been taken when M.N.Y. was a toddler and had a "soap bucket, or sand bucket, or something in front of her." He said that he did not show it to Mrs. Perrenot and that she heard about it from someone else. Mr. Spencer also testified that he had bathed with the girls but that it "was a long time ago when they were little." He said that M.N.Y.'s legal name is Yeats but that she had gone by Spencer for years, saying, "I'm just not going to argue with that, if she wants to use my name, I'm proud to have her do it."

Mr. Spencer testified that he left the Air Force in the early 1990s after he and several co-workers were wrongfully accused of sexually molesting a child. He was initially given a general discharge with honorable conditions, but prevailed in a contest, resulting in a full honorable discharge and a confidential settlement. He denied extracting any promises from Ms. Robison before providing his military records, saying he only asked if her file would be confidential.

Mr. Spencer also testified about a felony insurance fraud charge brought against him in Utah to which he pled no-contest. He explained that after Mrs. Spencer was involved in a serious car accident, he filed an insurance claim seeking $37,000 for a diamond that he said was dislodged from her wedding ring. Mr. Spencer testified that the insurance company decided to fight the claim, and that because he "did not have the wherewithal financially, emotionally, physically" to fight back, he pled no-contest to the fraud charge. In Mr. Spencer's plea documents, he said:

11

The states [sic] evidence would support that I submitted a false claim . . . claiming that a 2.2.-carat diamond from my wife's wedding ring was dislodged and lost during a motor vehicle accident. The states [sic] evidence would show the diamond had not dislodged and infact [sic] was intact. I claimed that the worth of the diamond was over $37,000.00. That the states [sic] evidence would show that I made misrepresentations and misleading statements during the claim process.

Mrs. Spencer was asked when she and her family returned from Utah, and she testified that starting in 1999, they had homes in both states, that they "weren't completely back here in '99," and that they moved here "[o]fficially with furniture, probably early 2000." Mrs. Spencer signed a contract to teach in Hays County beginning in August 1999, and testified that, although she contracted to teach in the 1999-2000 school year, at the time she was in "intensive therapy" due to her car accident and that she could not remember whether she worked in Hays County in 1999. She testified that she did not breach her contract, but she also testified that she "probably was not there in August of 1999." Later in her testimony, she said she was "commuting back and forth" between Texas and Utah in 1999. Still later, she said, "I was in and out at the beginning of the [1999-2000] school year, and I started officially being there full time mid October till late—early November." Mrs. Spencer taught until 2002, when a dispute arose with the district; her departure was covered by a confidentiality agreement with the school district.

Mrs. Spencer said she provided the school district with a baptismal certificate showing M.N.Y.'s last name as "Spencer," not "Yeats," because she did not have a copy of M.N.Y.'s birth certificate and so provided the baptismal certificate to enroll M.N.Y. in kindergarten. Similarly, Mrs. Spencer said she signed a false affidavit stating that it was against her family's religion to vaccinate the children because she "didn't have [M.N.Y.'s] shot records at the time, and it allowed her to be in kindergarten when she was supposed to be."

12

Mrs. Spencer testified about the photograph mentioned by Mrs. Perrenot, saying it was not pornographic in nature but was the kind of picture "every parent has." She also denied any inappropriate behavior when Mr. Spencer bathed or took care of the girls and said that CPS came to the house, interviewed the Spencers for several hours, and then "took no action."

Mrs. Spencer testified that M.N.Y. and S.N.S. were very close and that S.N.S. "hates" when M.N.Y. has to leave to visit Mr. Yeats. Mrs. Spencer did not believe it was in M.N.Y.'s best interest to live with Mr. Yeats because she has lived in Dripping Springs for several years and has a group of close friends there. She said that she wanted M.N.Y. and Mr. Yeats to have a good relationship and that she often reminded M.N.Y. to call Mr. Yeats. She denied that Mr. Spencer controlled her and said that visitation with the Vaughns was not in the children's best interest because, "I'm the mother of those children. I know what's best for them. And if I don't feel that it's good for them to be around people who are going to be negative about me and my husband, then I don't want her around them." She had no problems with the children's other grandparents.

Dr. Allison Wilcox, a child psychologist, treated M.N.Y. from April 2004 through August 2004. Dr. Wilcox testified that M.N.Y. is very articulate and intelligent but also anxious and depressed. Dr. Wilcox said Mr. Yeats was upset when he learned M.N.Y. had been prescribed antidepressants and felt that M.N.Y.'s sleep disturbances were instead due to too much caffeine and sugar. Mr. Yeats told Dr. Wilcox that he would try to bring M.N.Y. to Dripping Springs for therapy during his summer visitation in League City but never did so. Dr. Wilcox testified that M.N.Y. told her that she loved her father but did not like visiting him in Houston because it was far away and boring. M.N.Y. worried that her mother would get in trouble or even be arrested if M.N.Y. did not

13

want to go to Houston to visit her father. Dr. Wilcox testified that she thought the children should stay together but made no recommendations related to the Vaughns.

The jury found: it was in M.N.Y.'s and S.N.S.'s best interests to modify the agreed order related to grandparent access; material and substantial change in the circumstances of a child, conservator, or the Vaughns since the agreed order was signed in 1998; it was in M.N.Y.'s best interest for Mr. Yeats to designate her primary residence; material and substantial change in the circumstances of Mrs. Spencer, Mr. Yeats, or M.N.Y. since the 1997 conservatorship order between Mrs. Spencer and Mr. Yeats; both the Spencers concealed and aided or abetted in the concealment of the girls from the Vaughns and from Mr. Yeats; the Vaughns were injured by the concealment of the children; Mr. Yeats was injured by the concealment of M.N.Y.; and $1,000 would compensate Mr. Yeats for the Spencers' concealment of M.N.Y. The jury also recommended that M.N.Y. should be informed that when she is twelve years old she can choose which parent to live with; the Vaughns' access should not be reduced and they should have "longer duration visitations, perhaps over the weekend, fewer times"; and the children should visit the Vaughns together, have "minimum exposure" to the conflict between the parties, and receive counseling and therapy.

The trial court signed a final order naming Mr. Yeats and Mrs. Spencer M.N.Y.'s joint managing conservators; giving Mr. Yeats the right to determine M.N.Y.'s primary residence; giving Mrs. Spencer visitation; finding that it was in M.N.Y.'s best interest to change her conservatorship; granting the Vaughns "access, visitation and/or possession" of both children one weekend every other month and one week each summer; and requiring the Spencers to find a substitute period for the Vaughns' summer visitations if the Vaughns' proposed dates conflicted with the Spencers' plans. The court found that it was in the children's best interest to have visitation

14

together with the Vaughns, ordered the Spencers and Mr. Yeats not to interfere with the Vaughns' visitation, ordered the parties not to talk to the children about the parties' conflicts, ordered that both children receive counseling and therapy, and ordered the parties to notify each other and the court promptly of any change of address or phone number. Finally, the court ordered the Spencers to pay $50,000 in attorney's fees to the Vaughns and $50,000 in attorney's fees to Mr. Yeats.

The trial court entered the following findings of fact and conclusions of law: it was in the children's best interest for the Vaughns to have access to and visitation with the children; the testimony of Mr. and Mrs. Spencer was "not believable"; there was good cause to award Mr. Yeats and the Vaughns $50,000 in attorney's fees as damages for the interference with their possessory interests; the two attorney's fees awards were reasonable and necessary; and the Spencers each willfully and contemptuously disobeyed the agreed order sixty times with relation to each child. The court assessed a total of $12,000 in fines against each of the Spencers and ordered Mr. Spencer confined to jail for 1,200 days, suspending the sentences if the Spencers each paid $100, Mr. Spencer spent ten days in jail, and the Spencers obeyed the order's provisions related to the Vaughns' possession of and access to the children. The trial court denied the Spencers' motion for judgment notwithstanding the verdict and motions for new trial.

On appeal, the Spencers contend that former section 153.433 is unconstitutional on its face and as applied to them and that, even if the statute is constitutional, the trial court exceeded its statutory authority by granting the Vaughns possession of the children, rather than mere access. They further argue that the trial court abused its discretion in giving Mr. Yeats the right to decide M.N.Y.'s primary residence because there was insufficient evidence to show that the modification

15

was in M.N.Y.'s best interest. Finally, the Spencers argue that the trial court abused its discretion in awarding attorney's fees to Mr. Yeats and the Vaughns without competent expert testimony.

### Grandparent visitation

The Spencers challenge the constitutionality of former section 153.433, both on its face and as applied to them. However, this appeal concerns not the original grandparent visitation suit but instead the Spencers' motion to modify the agreed order. The supreme court has established that the presumptions in favor of parents set out in chapter 153 of the family code do not apply to modification proceedings under chapter 156. *In re V.L.K.*, 24 S.W.3d 338, 343 (Tex. 2000); *see also In re M.N.G.*, 113 S.W.3d 27, 35-36 (Tex. App.—Fort Worth 2003, no pet.). As the court explained, "Chapter 153 and Chapter 156 are distinct statutory schemes that involve different issues." *In re V.L.K.*, 24 S.W.3d at 343. In an original suit under chapter 153, the parent "has the benefit of the parental presumption," but "[b]ecause the Legislature did not express its intent to apply the presumption in Chapter 156 modification suits, courts should not apply the presumption in those cases." *Id.* Instead, modification proceedings should ask only whether the requirements of section 156.101 of the family code are met, "which requires the parties to show that (1) circumstances of a party affected by the order have materially and substantially changed; and (2) modification would be a positive improvement for the child." *Id.*; *see* Tex. Fam. Code Ann. § 156.101 (West Supp. 2007). In this modification proceeding under chapter 156, therefore, chapter 153 presumptions in favor of the Spencers do not apply. *See In re V.L.K.*, 24 S.W.3d at 343. Further, the Spencers agreed to the order granting the Vaughns' visitation and never challenged the order or the statute's constitutionality until filing this motion to modify. The trial court did not grant the Vaughns visitation over the Spencers' objections by relying on former section 153.433. The same policy

16

considerations underlying *In re V.L.K.* apply to motions to modify in grandparent visitation cases.[4]

*See id.*; *In re M.N.G.*, 113 S.W.3d at 33, 36.  Therefore, the Spencers are bound by *In re V.L.K.* and the burdens of proof set out in chapter 156 rather than the chapter 153 presumptions and *Troxel v. Granville*.[5]  *See* 530 U.S. 57, 66-67 (2000) (holding Washington grandparent-visitation statute is unconstitutional).

---

[4] *In re V.L.K.* concerned an order related to conservatorship, not grandparent visitation. 24 S.W.3d 338, 340 (Tex. 2000).  However, the reasoning applies with equal force to this modification proceeding related to grandparent access.  *See id.* at 343 (court did not distinguish between kinds of suits available under chapter 153 in concluding that chapter 153 presumptions do not carry into chapter 156); *In re M.N.G.*, 113 S.W.3d 27, 35-36 (Tex. App.—Fort Worth 2003, no pet.) (parental presumption did not apply in modification proceeding by grandparent seeking conservatorship of child against father, who was granted sole managing conservatorship in original divorce proceeding).

[5] The Spencers cite to *In re T.J.K.*, 62 S.W.3d 830 (Tex. App.—Texarkana 2001, no pet.), to support their contention that they should be able to seek review of the agreed order under *Troxel v. Granville*, 530 U.S. 57 (2000), in which the Supreme Court considered the constitutionality of Washington's grandparent-visitation statute.  However, we believe that *In re V.L.K.* governs this appeal, which concerns not an original grandparent visitation suit but instead the Spencers' petition to modify the agreed order.  The *T.J.K.* court held that a father who entered into an agreed order allowing grandparent visitation did not waive his right to complain about the grandparent-visitation statute's constitutionality in a later modification proceeding.  62 S.W.3d at 831-33.  The court ignored the fact that the father sought to challenge the statute through a petition to modify, however, and placed no importance on the fact that the father agreed to the visitation order.  *Id.*  We believe both issues are important.  *See In re M.N.G.*, 113 S.W.3d at 33-36 (holding that "*Troxel* does not support the trial court's placing of the burden on Grandmother to show unfitness of Father or harm or potential harm to the child as predicates for modification" and declining to accept "Father's argument, which flies in the face of *V.L.K.*, that the parental presumption must apply in the modification context"); *In re M.A.S.*, No. 04-06-00629-CV, 2007 Tex. App. LEXIS 7436, *4 (Tex. App.—San Antonio Sept. 12, 2007, no pet.) (mem. op.) (trial court erred in applying parental presumption in modification proceeding related to grandmother's possessory rights; "The correct standard is contained in section 156.101, which places the burden on the person seeking modification of an existing custody order to show that modification would be in the best interest of the child and that the circumstances of at least one of the parties affected by the order have materially and substantially changed since the order took effect."); *see also In re C.A.M.M.*, No. 14-06-00279-CV, 2007 Tex. App. LEXIS 8585, *10-12 (Tex. App.—Houston [14th Dist.] Oct. 30, 2007, no pet. h.) ("the ramifications of the modification statutes can be far-reaching and troubling, but any changes to the statutory scheme must come from the Legislature").

A trial court with continuing, exclusive jurisdiction may modify an order regarding conservatorship or the "possession of and access to" a child. Tex. Fam. Code Ann. § 156.001 (West 2002). A court may modify such an order if the evidence shows (1) a material and substantial change in the circumstances of the child or other party affected by the order and (2) that the change would be in the child's best interest. *Id*. § 156.101(1). We review a trial court's modification order for an abuse of discretion. *See, e.g.*, *In re J.E.P.*, 49 S.W.3d 380, 386-87 (Tex. App.—Fort Worth 2000, no pet.); *Maixner v. Maixner*, 641 S.W.2d 374, 376 (Tex. App.—Dallas 1982, no writ).[6] "The trial court is in the best position to observe the demeanor and personalities of the witnesses and can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record," and a trial court does not abuse its discretion if some substantive, probative evidence supports its decision. *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.) (citing *Jeffers v. Wallace*, 615 S.W.2d 252, 253 (Tex. Civ. App.—Dallas 1981, no writ)) (considering modification of terms governing joint managing conservatorship). When applying an abuse-of-discretion standard to a trial court's modification of provisions related to possession and custody of children, we ask first whether the trial court had sufficient information on which to exercise its discretion, applying a traditional sufficiency review, and if so, whether it acted reasonably in the application of its discretion. *Id*. at 477-78. The parties do not dispute that there was a change in circumstances, and it was the Spencers who sought the modification. The only question, therefore, is whether the record supports a finding that it was in the children's best interest for the Vaughns to have continued access to them through fewer but longer visits.

---

[6] *See In re J.R.D.*, 169 S.W.3d 740, 746-52 (Tex. App.—Austin 2005, pet. denied) (Puryear, J., concurring) (arguing that standards of review applied to conservatorship issues are inconsistent with constitutional nature of parental rights and for application of clear-and-convincing standard).

The Spencers testified that the Vaughns disliked Mr. Spencer and acted inappropriately and said negative things about him in front of the children. Ms. Robison, however, believed that it was the Spencers, not the Vaughns, who had shared details about the parties' dispute with the children and that the Vaughns truly had the children's best interests in mind. The other witnesses, including Mr. Yeats, testified that it would be beneficial for the children to have visitation with the Vaughns and their extended family. The jury determined that it was in the children's best interests to have contact with the Vaughns and recommended that the Vaughns have fewer but longer visits. The trial court, which had the opportunity to observe the witnesses, found that the Spencers were not credible witnesses and that it was in the children's best interests to have visitation with the Vaughns. The trial court did not err in refusing to terminate the Vaughns' visitations.[7]

---

[7] Even if we were to apply *Troxel*, we would hold that former section 153.433 is not facially unconstitutional, *see Lilley v. Lilley*, 43 S.W.3d 703, 713 (Tex. App.—Austin 2001, no pet.); Op. Tex. Att'y Gen. No. GA-0260 (2004), and the record does not reflect that the trial court failed to consider and give "special weight" to the Spencers' wishes for the children. *See Troxel*, 530 U.S. at 69; *In re C.P.J.*, 129 S.W.3d 573, 578-79 (Tex. App.—Dallas 2003, pet. denied). The trial court heard from the Spencers, who argued against visitation after having agreed earlier that visitation was appropriate, and from Mr. Yeats, the Vaughns, and other witnesses, all of whom testified it was in the children's best interests to have visitation with the Vaughns and the children's extended family. Further, the court specifically found that the Spencers' testimony was "not believable." Unlike *Troxel*, the Spencers wish to cut off the Vaughns from all contact with the girls. *See* 530 U.S. at 71. Finally, the Spencers themselves conceded that it was in the children's best interests to have contact with the Vaughns when they entered into the agreed order in 1998. The trial court did not violate the Spencers' constitutional rights by determining that the Spencers were not currently acting in the children's best interest and that withholding visitation with the Vaughns would harm the girls' best interests. *See In re C.P.J.*, 129 S.W.3d at 578-79 (trial court did not deny parent due process or disregard his parental rights where parent agreed to earlier grandparent visitation order and sought not to cut off visitation, but to reduce it; trial court's order attempted to resolve conflicts, and appellate court concluded that trial court "was able to craft its decision by according 'at least some special weight to the parent's own determination'").

19

The Spencers further argue that the trial court erred in allowing the Vaughns to have possession of the girls, rather than mere "access" to the girls. We disagree.

We recognize the distinction between "possession" and "access," *see In re L.M.M.*, No. 03-04-00452-CV, 2005 Tex. App. LEXIS 7191, at *34 (Tex. App.—Austin Aug. 31, 2005, no pet.) (mem. op.) (access allows conservator to visit and communicate with child; possession allows conservator to exercise control over child to exclusion of others), but note once more that this is a modification proceeding, not an original grandparent access suit. We differ with our sister court, which in *E.C., Jr., ex rel. Gonzales v. Graydon* determined that former section 153.433 allowed grandparent "access," not "possession." 28 S.W.3d 825, 831-32 (Tex. App.—Corpus Christi 2000, no pet.). In making that determination, the court looked to the same version of section 153.433 that is applicable to this case, which provided that a trial court should "order reasonable access to a grandchild" if certain requirements were met. *See* Act of May 27, 2005, ch. 484, § 4, 2005 Tex. Gen. Laws at 1345. The court did not note, however, that section 153.433 was titled, "*Possession* of and Access to Grandchild." *See id.* (emphasis added). Further, *Gonzales* was decided before 2005, when the legislature amended the statute to provide that a grandparent may obtain "reasonable possession of or access to a grandchild." Tex. Fam. Code Ann. § 153.433. In a bill analysis prepared in 2005 to explain the purpose and effect of the amendment, the Committee on Juvenile Justice & Family Issues stated that the amendment "make[s] consistent the language throughout Subchapter H [governing rights of grandparents] that the suit is for possession of or access to the child and not merely for access to the child, terminology which is currently

20

inconsistently applied."[8] House Comm. on Juvenile Justice & Family Issues, Bill Analysis, C.S.H.B. 261, 79th Leg., R.S. (2005). Finally, in cases involving grandparent access under former section 153.433, grandparents were frequently granted possession rather than mere access. *See, e.g.*, *In re N.A.S.*, 100 S.W.3d 670, 671 (Tex. App.—Dallas 2003, no pet.); *Sailor v. Phillips*, No. 03-00-00725-CV, 2001 Tex. App. LEXIS 7492, *2-3 (Tex. App.—Austin Nov. 8, 2001, no pet.) (not designated for publication); *Goolsbee v. Heft*, 549 S.W.2d 34, 34-35 (Tex. Civ. App.—Tyler 1977, no writ).[9] The court did not abuse its discretion in allowing the Vaughns possession of the girls.

The Spencers further contend that the trial court improperly submitted to the jury issues related to the Vaughns' visitation. We disagree. Section 105.002 governs jury trials in suits affecting the parent-child relationship, including suits "to modify access rights," *Martin v. Martin*, 776 S.W.2d 572, 574 (Tex. 1989) (considering predecessor to section 105.002), and allows a party

---

[8] Before being amended in 2005, subchapter H, which was titled, "Rights of Grandparent," seemed to use "access" and "possession" interchangeably. Section 153.432, titled, "Suit for Access," allowed a grandparent to sue for "access" by filing an original suit or a petition to modify. Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 Tex. Gen. Law 113, 157. Section 153.433, titled, "Possession of and Access to Grandchild," provided for grandparent "access" if certain conditions were met. Act of May 26, 1997, 75th Leg., R.S., ch. 1397, § 1, 1997 Tex. Gen. Laws 5250, 5250-51. Finally, section 153.434, titled, "Limitation on Right to Request Access," barred grandparents from requesting "possession of or access to" their grandchildren under certain circumstances. Act of May 30, 1999, 76th Leg., R.S., ch. 1390, § 13, 1999 Tex. Gen. Laws 4696, 4699.

[9] We note that in the agreed order, the Spencers agreed that the Vaughns could have possession of the girls away from the Spencers' home. The agreed order provided that for six months after the signing of the order, the Vaughns were to have six hours of "access" to M.N.Y. and S.N.S. each month. The first three hours of their time with M.N.Y. and all of their time with S.N.S. were to occur at the Spencers' home, but the other three hours with M.N.Y. were not limited to the Spencers' house. After the first six months, the Vaughns were allowed to have "access" to both girls for forty-eight hour visits twice a year as well as day-long visits once a month; those visits were not required to be exercised at the Spencers' home. The agreed order also refers to the Vaughns as having "possession" of the children during their designated visitation times and includes provisions governing the Vaughns' return of the children to the Spencers.

21

to demand a jury trial in a suit affecting a parent-child relationship unless the suit seeks adoption or to adjudicate parentage. *See* Tex. Fam. Code Ann. § 105.002(a), (b) (West Supp. 2007). In February 2003, at the time the Spencers filed their petition for modification, subsection 105.002(c) provided that a party was entitled to a jury verdict on issues related to conservatorship and the determination of a child's primary residence. *See* Act of May 27, 2003, 78th Leg., R.S., ch. 1036, § 2, 2003 Tex. Gen. Laws 2987, 2987-88 (amending section 105.002(c)). A party was not *entitled* to a jury verdict on issues of "a specific term or condition of possession to the child" or a conservator's rights or duties other than the issue of primary residence, but under former subsection 105.002(c)(3), the court was permitted to submit such issues to the jury, although under former subsection 105.002(d) the jury's answer on those issues was "advisory only." *See* Act of May 8, 1997, 75th Leg., R.S., ch. 180, § 1, 1997 Tex. Gen. Laws 1033, 1033-34. In 2003, the legislature amended subsection 105.002(c) and repealed subsection 105.002(d), but the amendments to subsection 105.002(c) apply only to a suit filed on or after September 1, 2003. *See* Act of May 27, 2003, ch. 1036, § 2 (amending section 105.002(c)), § 22 (repealing section 105.002(d)), § 23(c) (changes to section 105.002(c) apply only to cases filed after effective date), 2003 Tex. Gen. Laws at 2987-88, 2994.[10] Therefore, although the Vaughns may not have been *entitled* to a jury

---

[10] The current version of section 105.002 provides that except for suits for adoption or to adjudicate parentage, a party may demand a jury trial and is entitled to a jury verdict, which the trial court may not contravene, on the appointment of a sole managing conservator, joint managing conservators, or a possessory conservator; which joint managing conservator should have the right to designate the child's primary residence; and whether to impose a geographic restriction on the joint managing conservators. Tex. Fam. Code Ann. § 105.002(a), (b), (c)(1) (West Supp. 2007). The trial court may not submit to the jury questions on the issues of child support, "a specific term or condition of possession of or access to the child," or a conservator's rights or duties other than which conservator may designate the child's primary residence. *Id*. § 105.002(c)(2).

22

answer related to a "specific term or condition of possession of or access," the trial court had the discretion to submit such issues to the jury. Further, the trial court asked only whether it was in the children's best interests to modify the agreed order and whether the parties' circumstances had changed; it did not ask about a "specific term or condition of access to or possession of" the children. *See* Tex. Fam. Code Ann. § 105.002(c)(2)(B) (West Supp. 2007). The trial court did not abuse its discretion in submitting those questions to the jury and using the jury's answers and recommendations in an advisory capacity.

Based on this record, we hold that the trial court did not abuse its discretion in modifying the agreed order to allow the Vaughns to have weekend visitations at their home with the children every other month and for one week in the summer. We overrule the Spencers' first, second, and third issues.

### Conservatorship of M.N.Y.

We now turn to the Spencers' fourth issue, complaining that the trial court abused its discretion by giving Mr. Yeats the right to determine M.N.Y.'s primary place of residence. To support modification of the 1997 conservatorship order, Mr. Yeats had the burden to prove that modification was in M.N.Y.'s best interest and that "the circumstances of the child, a conservator, or other party affected by the order [had] materially and substantially changed since the date of the rendition of the order." *See* Tex. Fam. Code Ann. § 156.101(1).[11] The Spencers do not challenge

---

[11] Section 156.101 also provides that a conservatorship order may be modified if it is in the child's best interest and: (1) the child is at least twelve years old and has filed with the court a statement naming the person the child prefers to have the exclusive right to determine the child's primary residence, or (2) the conservator with the exclusive right to determine the child's primary residence voluntarily relinquishes the primary care and possession of the child to another for at least six months. *See id*. § 156.101(2), (3) (West Supp. 2007).

the jury's finding on the second element, changed circumstances since the 1997 order. They complain that the evidence is both legally and factually insufficient to support a finding that giving that right to Mr. Yeats was in M.N.Y.'s best interest.

Initially, we note that under former section 105.002(c)(1) of the family code, a party was entitled to a jury verdict on the issue of "the determination of the primary residence of the child" and the trial court "may not contravene" the jury's verdict on that issue. Act of May 8, 1997, ch. 180, § 1, 1997 Tex. Gen. Laws at 1034.[12] Thus, unless there was legally insufficient evidence to support the jury's determination that Mr. Yeats should be allowed to determine M.N.Y.'s primary residence, the trial court could not have entered a judgment contravening the jury's decision. *See Lenz v. Lenz*, 79 S.W.3d 10, 20 (Tex. 2002); *Harris v. Texas Dep't of Family & Protective Servs.*, 228 S.W.3d 819, 823 (Tex. App.—Austin 2007, no pet.); *Brunson v. Brunson*, 502 S.W.2d 578, 579 (Tex. Civ. App.—Fort Worth 1973, no writ).[13]

---

[12] The provision governing a party's entitlement to a jury verdict on which joint managing conservator has the right to designate a child's primary residence remains substantially the same under the 2003 amendments. *See id*. § 105.002(c)(1)(D).

[13] We disagree with *Corrales v. Department of Family & Protective Services*, in which our sister court reviewed a trial court's refusal to contravene a jury's verdict and held that "the appropriate challenge must be directed to a traditional sufficiency review: Is the evidence legally and factually sufficient to support the jury's finding that appointing the Department as the children's managing conservator was in their best interest?" 155 S.W.3d 478, 488 (Tex. App.—El Paso 2004, no pet.). As in other civil cases involving a trial court's granting of a judgment notwithstanding the verdict, we believe the inquiry must be limited to whether there was legally sufficient evidence. *See Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227 (Tex. 1990) ("In order to uphold a trial court's judgment notwithstanding the verdict, an appellate court must determine that no evidence supports the jury's findings."); *John Paul Mitchell Sys. v. Randalls Food Mkts., Inc.*, 17 S.W.3d 721, 728 (Tex. App.—Austin 2000, pet. denied) ("We will uphold a trial court's judgment notwithstanding the verdict only if we determine that there is no evidence to support the jury's findings."). To go further and inquire into factual sufficiency would render meaningless section 105.002's provision barring a trial court from contravening a jury's verdict on certain issues related to a child's care. *See Lenz v. Lenz*, 79 S.W.3d 10, 20 (Tex. 2002) ("because we have concluded that there is legally sufficient evidence to support the jury's verdict in this case, we further conclude that the trial court

We therefore consider whether the evidence was legally sufficient to support the jury's finding that it was in M.N.Y.'s best interest for Mr. Yeats to determine her primary residence. *See Harris*, 228 S.W.3d at 822-23. Mr. Yeats sought the modification related to M.N.Y.'s primary residence and so had the burden to establish by a preponderance of the evidence that it would be harmful to M.N.Y. to maintain the status quo and that the change would be a positive improvement for her. *See In re L.M.M.*, 2005 Tex. App. LEXIS 7191, at \*25-26. Because the Spencers did not have the burden of proof, we ask whether there was any evidence to support the finding. *See Harris*, 228 S.W.3d at 823. We view the evidence in the light most favorable to the jury's finding, indulging every reasonable inference that supports it, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 821-22 (Tex. 2005); *Harris*, 228 S.W.3d at 823. If reasonable people could differ in their conclusions, we will not substitute our judgment for the jury's, and we must defer to the jury's reasonable determinations of the credibility of the witnesses, the weight to be given the testimony, and the resolution of evidentiary conflicts. *City of Keller*, 168 S.W.3d at 819-20, 822; *Harris*, 228 S.W.3d at 823.

Although Ms. Robison recommended that M.N.Y. remain with the Spencers because M.N.Y. and S.N.S. have a close relationship, she also testified that if not for the relationship between the sisters, she would recommend that M.N.Y. live primarily with Mr. Yeats. There was testimony that the Spencers were uncooperative with Ms. Robison, Mr. Yeats, and the Vaughns and that they

---

improperly contravened the jury's verdict"). *But see In re J.A.J.*, No. 07-0511, 2007 Tex. LEXIS 978, \*13 n.5 (Tex. Nov. 2, 2007) (citing *Corrales* and stating that "[i]n a jury trial, a trial court may not render an order in contravention of the jury's findings. Tex. Fam. Code Ann. § 105.002(c)(1)(A). Jury findings underlying a conservatorship appointment are subject to ordinary legal and factual sufficiency review.").

interfered with Mr. Yeats's visitation with M.N.Y., including trying to make M.N.Y. think that Mr. Yeats was late for visits. Ms. Robison and others believed that M.N.Y. was stressed and depressed because the Spencers put M.N.Y. in the middle of their disputes with others. There were allegations that Mr. Spencer might have engaged in inappropriate behavior in the past, although both Spencers strongly denied it.[14] Mrs. Spencer admitted to signing a false affidavit related to M.N.Y.'s vaccinations, which Mr. Yeats believed put M.N.Y.'s health at risk; the Spencers improperly used "Spencer" as M.N.Y.'s last name in school registration and health insurance documents; and Mr. Spencer pleaded no-contest to charges of insurance fraud. The Spencers moved to Utah without informing the Vaughns, with whom the Spencers had just signed a visitation agreement, they threatened to move and not tell Mr. Yeats their new address if he told anyone where they were, and they made it difficult for Mr. Yeats to see his daughter. They moved back to Texas in 1999 or early 2000, but did not inform Mr. Yeats or the Vaughns of their address until about three years later. In letters to the Vaughns, the Spencers misstated the terms of the agreed order, improperly using what they perceived as the Vaughns' failure to meet the order's requirements as grounds for "excluding" the Vaughns from seeing the children as agreed. Mr. Yeats testified that he had problems with the Spencers related to M.N.Y.'s health insurance, that he worried the Spencers were not properly caring

---

[14] We disagree with the Spencers that "[m]ere allegations of abuse are no evidence of abuse, and the jury was not entitled to give them any weight." Certainly the allegations made in this case would not be "clear and convincing" evidence that would support a termination of parental rights. *See In re S.A.P.*, 169 S.W.3d 685, 704-05 (Tex. App.—Waco 2005, no pet.). However, it was for the jury to consider the credibility of the witnesses putting forth and denying those allegations and determine whether to give the allegations any weight at all. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819, 821-22 (Tex. 2005); *In re S.A.P.*, 169 S.W.3d at 704-05 ("sensational and unproven allegation" was "scant evidence" that father had endangered child).

for M.N.Y.'s health, and that he was sensitive to and wanted to help with M.N.Y.'s weight concerns because he had faced similar issues himself.

Having M.N.Y. live primarily with Mr. Yeats will result in the sisters living in different households. However, the relationship between the sisters, as important as it is, is not the only factor that the jury could have considered. *See In re K.L.R.*, 162 S.W.3d 291, 306 (Tex. App.—Tyler 2005, no pet.) ("Split custody of two or more children of the same marriage is a factor, among many, to consider in determining the best interest of a child. Courts have traditionally applied the policy of keeping siblings together in custody decisions only to children of the same marriage." (citations omitted)). The Spencers' behavior related to other adults, their credibility or lack thereof, and their behavior in placing M.N.Y. squarely in the middle of their disputes with Mr. Yeats and the Vaughns were all valid concerns for the jury in making their determination about M.N.Y.'s primary residence. Despite the recommendations of Ms. Robison and Dr. Wilcox, we cannot hold that the jury's verdict is not supported by any evidence. We overrule the Spencers' fourth issue on appeal.

**Attorney's fees**

Finally, the Spencers argue that the trial court abused its discretion by awarding attorney's fees because the awards are not supported by competent evidence. We disagree.

"The award of attorney's fees in a suit affecting the parent-child relationship is within the trial court's discretion." *Bruni v. Bruni*, 924 S.W.2d 366, 368 (Tex. 1996); *see* Tex. Fam. Code Ann. § 106.002(a) (West Supp. 2007) (in a suit affecting parent-child relationship, "the court may render judgment for reasonable attorney's fees and expenses"). The determination of what is a reasonable amount of attorney's fees is a fact question, and the reasonableness and necessity of the

27

fees must be supported by competent evidence. *In re T.L.K.*, 90 S.W.3d 833, 841 (Tex. App.—San Antonio 2002, no pet.); *see Woollett v. Matyastik*, 23 S.W.3d 48, 52-53 (Tex. App.—Austin 2000, pet. denied). The parties may, however, agree to documentary evidence, eliminating the need for live expert testimony. *See Lohmann v. Lohmann*, 62 S.W.3d 875, 880-81 (Tex. App.—El Paso 2001, no pet.) (parties agreed to submit attorney's fees to court and that attorneys' bills were fair and reasonable); *Armstrong v. Steppes Apts., Ltd.*, 57 S.W.3d 37, 50 (Tex. App.—Fort Worth 2001, pet. denied) ("By agreement, the parties below submitted their attorneys' fee evidence by affidavit.").

The Spencers never complained about the sufficiency or form of the evidence establishing the Vaughns' and Mr. Yeats's attorney's fees. Mrs. Spencer was represented by counsel at trial, and Mr. Spencer represented himself pro se. After the parties had rested, the trial court held a hearing outside the jury's hearing to discuss the jury charge and attorney's fees. The court stated, "Counsel informed the Court that they're submitting the attorneys' fees issue to the Court, and each is making no argument. And I take it that you, Mr. Spencer, dispute either the necessity or reasonableness of Mr. Bell [the Vaughns' attorney] and Mr. Cheatham's [Mr. Yeats's attorney] attorney's fees[.]"[15] The record does not reflect that Mr. Spencer responded to the trial court to either agree or disagree, much less that he clarified whether he challenged the fees' necessity or reasonableness or both or that he obtained a ruling on his complaint. Indeed, although Mr. Spencer articulated several complaints related to the jury's charge during this hearing, he did not voice any

---

[15] The reporter's record does not include punctuation at the end of the trial court's statement, making it unclear whether this was a statement or a question. In its findings of fact and conclusions of law, the court stated that the parties "agreed to submit their requests for attorneys fees to the Court" and that the Spencers "agreed in open court that the issues of contempt and attorneys fees be heard by the Court."

28

objections to the evidence related to attorney's fees or raise the issue later in a written motion, including his motions for new trial.[16] Mrs. Spencer's attorney agreed when the trial court asked, "[I]n considering the issue of attorney's fees by the Court rather than to the jury, all you're asking me to do is to consider the fees as represented by the various exhibits, and then determine both reasonableness and necessity as to Mr. Bell and Mr. Cheatham; is that where we stand?" The Vaughns' attorney submitted detailed invoices showing that from March 2003 through September 2004, one month before trial, the Vaughns had incurred more than $73,000 in attorney's fees and had paid $44,500. Mr. Yeats's attorney submitted affidavits and detailed statements showing that Mr. Yeats had incurred more than $139,000 in attorney's fees through late September 2004 and had paid more than $63,000. Mr. Spencer offered into evidence a bill by an attorney who assisted the Spencers in an earlier mandamus proceeding. He never, however, voiced a complaint about the sufficiency of the Vaughns' or Mr. Yeats's evidence.

To preserve a complaint for our review, a party must timely raise his complaint before the trial court, stating the grounds for his complaint "with sufficient specificity to make the trial court aware of the complaint," and obtain a ruling from the trial court. Tex. R. App. P. 33.1(a). Mrs. Spencer stipulated to the Vaughns' and Mr. Yeats's evidence of their attorney's fees, and Mr. Spencer did not raise any complaint, much less one that can be considered specific, nor obtain the trial court's ruling. *See id*. Had either of them done so, the trial court would have known not to accept the attorneys' documents as the only evidence, and the Vaughns and Mr. Yeats could have

---

[16] The Spencers filed a total of three motions for new trial–one by Mrs. Spencer through her attorney and two by Mr. Spencer. The Spencers both stated without explanation or argument that "[t]he damages awarded by the jury against Petitioner are excessive." In its answers, the jury found that $1000 would compensate Mr. Yeats for the Spencers' concealment of M.N.Y.

presented live expert testimony from their attorneys. Because the Spencers never complained about the form of the evidence supporting an attorney's fee award, either at the hearing or in a motion for a new trial or other motion, the Spencers have waived any complaint related to the sufficiency of the evidence supporting the trial court's awards. *See Reagan Nat'l Adver. of Austin, Inc. v. Capital Outdoors, Inc.*, 96 S.W.3d 490, 497 (Tex. App.—Austin 2002, pet. granted, judgm't vacated w.r.m.); *L & F Distribs. v. Cruz*, 941 S.W.2d 274, 285-86 (Tex. App.—Corpus Christi 1996, writ denied). The evidence presented amounts to some evidence of the reasonableness and necessity of the parties' attorney's fees. *Hall v. Hubco, Inc.*, No. 14-05-00073-CV, 2006 Tex. App. LEXIS 1037, *22-23 (Tex. App.—Houston [14th Dist.] Feb. 9, 2006, pet. denied); *Jackson v. Barrera*, 740 S.W.2d 67, 68-69 (Tex. App.—San Antonio 1987, no writ). The trial court awarded the Vaughns and Mr. Yeats lower sums than they had been billed. We cannot hold that the trial court abused its discretion in making its attorney's fees awards. We overrule the Spencers' fifth issue on appeal.

### Conclusion

Having overruled the Spencers' issues on appeal, we affirm the trial court's orders.

_____

David Puryear,  Justice

Before Justices Patterson, Puryear and Waldrop

Affirmed

Filed:   March 6, 2008

30