**Opinion issued September 24, 2015**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-14-00104-CV

———————————

**WHITE LION HOLDINGS, L.L.C., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 98th District Court**
**Travis County, Texas**
**Trial Court Case No. D-1-GV-13-001068**

## MEMORANDUM OPINION ON REHEARING

The trial court entered summary judgment for the State of Texas that White

Lion Holdings, L.L.C. violated the terms of a compliance plan issued by the Texas

Commission on Environmental Quality (TCEQ). White Lion appeals, arguing in

two issues that the trial court improperly denied its motion for continuance and that

the summary-judgment evidence raised questions of material fact sufficient to prevent summary judgment. We affirm.[1]

## Background

In 2006, the State initiated this lawsuit, alleging that White Lion violated a waste-management compliance plan issued by TCEQ. The plan and a contemporaneously-issued permit govern the monitoring, treatment, and management of surface wastewater impoundments and a plume of contaminated groundwater at a facility now owned by White Lion and formerly used for pipe manufacturing in Rosenberg, Texas. During its operational life, the facility generated hazardous wastewater that was treated on-site in a system that included five surface impoundments. The prior owner of the facility, Vision Metals, discovered that the impoundments were sources of groundwater contamination, including elevated concentrations of cadmium, cobalt, lead, barium, chromium, nickel, silver, zinc, iron, sulfate, and acidic compounds.

---

[1] On April 9, 2015, we rendered our original opinion in this case. On May 26, 2015, White Lion filed three motions: a motion to supplement the record, a motion for rehearing, and a motion for rehearing en banc. It subsequently amended the motion for panel rehearing and the motion for rehearing en banc. We deny the motion to supplement the record and motion for panel rehearing, but withdraw our opinion and judgment of April 9, 2015, and issue this opinion and a new judgment in their stead. We dismiss the motion for rehearing en banc as moot. *See, e.g.*, *Brookshire Bros., Inc. v. Smith*, 176 S.W.3d 30, 41 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

In 1988, the TCEQ's predecessor, the Texas Natural Resources Conservation Commission, issued Hazardous Waste Permit 50129-001 to Vision Metals to govern the management, closure, and long-term care of the wastewater impoundments. Contemporaneously, it issued to Vision Metals Compliance Plan 50129. The compliance plan has been modified several times since then.

White Lion acquired the facility in a bankruptcy sale in April 2004. At the same sale, various third parties purchased machinery and equipment at the property. According to White Lion, some of those third parties damaged the facility while removing their property in the period from April 2004 through August of that year. White Lion estimated the costs of repairs to exceed $1.4 million and initiated lawsuits to recover damages from the third parties.

Meanwhile, the existing permit and compliance plan were transferred to White Lion. White Lion, however, did not provide the State with a required "financial assurance" mechanism, such as a bond or irrevocable letter of credit, guaranteeing its performance of its obligations under the permit and compliance plan. It did, however, request an extension of time to provide such assurance. White Lion also discussed with the United States Environmental Protection Agency switching the site to a "plume management approach," which would simplify management of the site, but the EPA told White Lion that such an approach was not feasible.

3

TCEQ gave White Lion an extension of time to address outstanding compliance issues and submit an amendment to the compliance plan but did not extend the time for White Lion to provide financial assurance. White Lion never submitted any application to amend the compliance plan and never provided any financial assurance.

In 2006, the State sued White Lion for violations of the compliance plan, seeking civil penalties under the Water Code, unpaid hazardous waste facility fees, an injunction to secure White Lion's performance of its duties under the compliance plan, and attorney's fees. The State later amended its petition, naming White Lion's owner, Bernard Morello, as an additional defendant.

The case was set for trial in 2008, continued, set again in 2011, and continued again. In August 2013, the State filed a motion for summary judgment. White Lion responded, arguing in part that full compliance with the plan was impossible, that it had complied to the extent possible, and that injunctive relief was improper in the absence of a showing of a risk of irreparable injury. White Lion also moved for a continuance to obtain an expert opinion on the costs and feasibility of repairs to the site.

The trial court held a hearing at which it denied White Lion's motion for continuance and then granted the State's motion for summary judgment. It entered judgment that the State recover from White Lion (1) civil penalties of $325,600,

4

(2) unpaid hazardous waste facility fees of $129,464.15, (3) pre-judgment interest on the unpaid hazardous waste facility fees, (4) attorney's fees, (5) costs of court, and (6) post-judgment interest.[2]  It also enjoined White Lion as follows: "White Lion shall [immediately] comply with each limitation, requirement, and condition of the Compliance Plan."  In the same order, the trial court severed the State's case against Morello, rendering the judgment against White Lion final.  The State later obtained summary judgment in the severed case against Morello.

In two issues, White Lion appeals, arguing, first, that the trial court erred in denying White Lion's motion for continuance and, second, that the trial court improperly granted summary judgment because White Lion raised questions of material fact.[3]

## Our Jurisdiction over this Appeal

On rehearing, White Lion argues for the first time that we lack jurisdiction to hear this appeal.  It argues that the State's case against Morello was improperly severed from the case against White Lion and that, under controlling authority, a

---

[2]    The original judgment incorrectly stated, under the heading "Post-Judgment Interest," that "[t]he State shall recover *pre*-judgment interest on all amounts awarded in this judgment at the annual rate of 5.00%."  On the State's motion, the trial court entered judgment *nunc pro tunc* correcting "pre-judgment" in that section to "post-judgment" and making other clerical corrections.

[3]    On January 7, 2014, the Texas Supreme Court ordered this appeal transferred from the Court of Appeals for the Third District of Texas.  See TEX. GOV'T CODE ANN. § 73.001 (West 2013) (authorizing transfer of cases).  We are unaware of any conflict between the precedent of the Court of Appeals for the Third District and that of this Court on any relevant issues.  *See* TEX. R. APP. P. 41.3.

5

judgment rendered after an improper severance is not an appealable, final judgment. In support of this argument, White Lion has submitted to this Court (1) the State's motion for summary judgment against Morello, (2) Morello's response, (3) the final summary judgment against Morello, (4) Morello's motion for new trial, and (5) the "Trial Court Order, if any, denying Motion for New Trial." It asks that we grant leave to supplement the record to include these documents and, having done so, hold that the severance was improper.

White Lion's jurisdictional argument has three parts: (1) the State's case against Morello is based entirely on his status as the sole member of White Lion; (2) the severance order is invalid because it (a) severs a single cause of action into separate claims and (b) severs inextricably intertwined claims against different parties; and (3) an invalid severance requires dismissal under the case law of the Austin Court of Appeals where this appeal was originally filed.

We have jurisdiction only over final judgments "[u]nless there is a statute specifically authorizing an interlocutory appeal." *Cherokee Water Co. v. Ross*, 698 S.W.2d 363, 365 (Tex. 1985) (orig. proceeding) (per curiam); *see Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95 (Tex. 2012). "Jurisdiction over the subject matter of an action may not be conferred or taken away by consent or waiver, and its absence may be raised at any time." *Carroll v. Carroll*, 304 S.W.3d 366, 367

6

(Tex. 2010) (per curiam) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993)).

Under Rule 41 of the Texas Rules of Civil Procedure, "[a]ny claim against a party may be severed and proceeded with separately." TEX. R. CIV. P. 41. "This rule grants the trial court broad discretion in the matter of severance and consolidation of causes." *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 658 (Tex. 1990) (citing *McGuire v. Commercial Union Ins. Co. of N.Y.*, 431 S.W.2d 347 (Tex. 1968)). "The trial court's decision to grant a severance will not be reversed unless it has abused its discretion." *Id.* (citation omitted). "A claim is properly severable if (1) the controversy involves more than one cause of action, (2) the severed claim is one that would be the proper subject of a lawsuit if independently asserted, and (3) the severed claim is not so interwoven with the remaining action that they involve the same facts and issues." *Id.* (citations omitted).

The first step of White Lion's argument is factually incorrect: the State's motion against Morello focuses on Morello's actions and failures to act, as distinct from White Lion's actions and inactions. Among other theories, the State argues that Morello is liable for penalties because (1) he purchased the site personally and assigned it to White Lion, but did not himself comply with his own obligations with respect to the site; (2) as a corporate officer, he can be held personally liable

7

for penalties under the Water Code; (3) he lacked the expertise to manage the site and made no efforts to manage it until the State filed suit; and (4) he personally took or failed to take actions that resulted in White Lion's violation of the compliance plan, such as removing the groundwater treatment system, throwing away "monitoring well protective housing caps," and directing White Lion not to comply with the compliance plan in various ways.

The second step of White Lion's argument is also flawed. The severance order did not split one cause of action, but rather split two causes of action on the same legal theory: one claim against each defendant. Nor did it split inextricably intertwined claims. The claims against White Lion and those against Morello are based on the Water Code, which imposes liability on any "person who causes, suffers, allows, or permits a violation of a statute, rule, order, or permit relating to any . . . matter within [TCEQ's] jurisdiction to enforce." TEX. WATER CODE. ANN. § 7.102 (West 2008). Statutes providing for liability of any "person" in violation allow courts to render judgments against both corporate entities and their agents. *E.g.*, *Miller v. Keyser*, 90 S.W.3d 712, 715–18 (Tex. 2002) (because Deceptive Trade Practices Act imposes liability on "any person" who violates it, both companies and their agents can be held liable). The ways in which White Lion and Morello allegedly violated the compliance plan are different. Moreover, to the extent the facts supporting the State's claims against White Lion are intertwined

8

with those supporting the claims against Morello, those facts are undisputed. No party disputes, for example, that no monitoring is being performed at the site or that the site's remediation, monitoring, and control systems are offline, disabled, dismantled, or missing entirely. In other words, the claims overlap only with respect to facts that are conclusively established in the record, and there is no risk that a severance would create inconsistent judgments.

In its motion for rehearing, White Lion also argues for the first time that the severance violates the due process protections and prohibitions on excessive fines in the United States and Texas Constitutions. It did not, however, preserve these arguments by raising them in the trial court, nor did it raise them on appeal. "As a rule, a claim, including a constitutional claim, must have been asserted in the trial court in order to be raised on appeal." *Dreyer v. Greene*, 871 S.W.2d 697, 698 (Tex. 1993). Both due-process and excessive-fines arguments can be waived.[4] By failing to preserve these arguments, White Lion has waived them. TEX. R. APP. P. 33.1(a)(1).

---

[4] *E.g.*, *In re L.M.I.*, 119 S.W.3d 707, 711 (Tex. 2003) (due process); *Anderson v. McCormick*, Nos. 01-12-00856-CV, 01-12-00857-CV, 2013 WL 5884931, at *3 (Tex. App.—Houston [1st Dist.] Oct. 31, 2013, no pet.) (mem. op.) (due process); *Ratsavong v. Menevilay*, 176 S.W.3d 661, 671 (Tex. App.—El Paso 2005, pet. denied) (due process); *Konkel v. Otwell*, 65 S.W.3d 183, 188 (Tex. App.—Eastland 2001, no pet.) (excessive fines); *Armstrong v. Steppes Apartments, Ltd.*, 57 S.W.3d 37, 49 (Tex. App.—Fort Worth 2001, pet. denied) (both due process and excessive fines).

We hold that the trial court did not abuse its discretion by granting the State's conditional motion for severance. Because the severance was proper, we need not reach the final step of White Lion's argument: whether this Court, as the transferee court of an appeal originally filed in the Austin Court of Appeals, can exercise jurisdiction over a summary judgment that purports to be final but results from an improper severance. Because the documents that White Lion has provided from the State's case against Morello are relevant only to its jurisdictional arguments, we deny White Lion's motion to supplement the record.

We have jurisdiction over this appeal. Accordingly, we proceed to the merits.

**Motion for Continuance**

In its first issue, White Lion argues that the trial court erred in denying White Lion's motion for continuance. White Lion requested a continuance on two occasions. First, in its response to the State's motion for summary judgment, it requested "that any hearing on [the motion] be reset for at least 90 days to give [White Lion] time to consult with experts to determine what remedial action is feasible." In that response, it admitted that the facility's mitigation and monitoring systems had no electrical power and were not operational, arguing that "[c]ompliance with the [Compliance] Plan has been rendered impractical and commercially and economically [i]nfeasible by damages to the facility by third

10

parties." White Lion then filed a motion for continuance, asking "that the court reset the hearing [on] the State's [motion for summary judgment] for 90 days . . . to give [White Lion] time to confer with experts to determine the cost and feasibility of restoring the existing remedial system and/or modifying the remedial system." According to White Lion, it "want[ed] to resolve this matter but need[ed] a reasonable time to evaluate the situation." In the motion, it acknowledged that it needed "an extension to comply with TCEQ's requests" and that, as of August 2013, White Lion "need[ed] to quickly come into full compliance with the existing [compliance] plan." The trial court denied the motion for continuance at the start of the hearing on the motion for summary judgment.

## A.     Standard of review

We review a trial court's ruling denying a motion for continuance for an abuse of discretion. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002); *Carter v. MacFadyen*, 93 S.W.3d 307, 310 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). A trial court abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Marchand*, 83 S.W.3d at 800. The trial court may order a continuance of a summary judgment hearing if it appears "from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition." TEX. R. CIV. P. 166a(g). In a first motion for continuance

11

based on the ground that testimony is needed, the affidavit supporting the motion must (1) show that the testimony is material and (2) state that due diligence has been used to procure the testimony, describing the diligence used and why it failed, if known. TEX. R. CIV. P. 252. In determining whether there has been an abuse of discretion, we view the evidence in the light most favorable to the trial court and indulge every presumption in favor of the judgment. *Hatteberg v. Hatteberg*, 933 S.W.2d 522, 526 (Tex. App.—Houston [1st Dist.] 1994, no writ) (citing *Parks v. U.S. Home Corp.*, 652 S.W.2d 479, 485 (Tex. App.—Houston [1st Dist.] 1983, writ dism'd)).

## B.    The trial court did not abuse its discretion

White Lion has not shown that the trial court abused its discretion by denying the requested continuance. White Lion acquired the property in April 2004. TCEQ transferred the then-existing permit and compliance plan to White Lion and issued a revised permit and compliance plan identifying White Lion as the permittee and property owner in July 2004. The State initiated this suit in April 2006 and filed its motion for summary judgment in August 2013. White Lion thus had possession of the property for over nine years and notice of the State's claims for more than seven years before the summary-judgment motion. But it admits that it made no attempt to retain an environmental consultant during that period of over nine years, waiting until just two weeks before the State filed its motion for

12

summary judgment to begin its search. White Lion makes no attempt in either its motion for continuance or its appellate brief to explain why it could not have retained an expert and obtained a report before that time.

Further, White Lion did not articulate in its motion for continuance why it needed an expert's opinion before the motion for summary judgment hearing. It stated only that it wanted "time to confer with experts to determine the cost and feasibility of restoring the existing remedial system and/or modifying the remedial system." But those were not issues before the trial court when it considered the motion for summary judgment. That motion addressed only whether White Lion had complied with the compliance plan and governing law and, if not, what civil penalties, unpaid fees, and injunctive relief should be assessed against it. White Lion's evidence, if obtained, would have pertained to the cost of remediation, not White Lion's liability or the calculation of penalties or fees for its past noncompliance. Indeed, White Lion made no attempt to connect the expert opinions that it sought to any of the claims on which the State obtained summary judgment.

We also note that the affidavit supporting the motion for continuance did not describe the evidence that White Lion sought, show that the evidence is material, state that due diligence has been used to procure the evidence, or describe the diligence and why it failed, if known. TEX. R. CIV. P. 252.

13

Because White Lion failed to demonstrate that it needed a continuance to obtain evidence essential to its defense, we hold that the trial court did not abuse its discretion in denying the motion for continuance. Accordingly, we overrule White Lion's first issue.

**Motion for Summary Judgment**

In its second issue, White Lion argues that the trial court erred in granting the State's motion for summary judgment. White Lion contends that it demonstrated the existence of genuine issues of material fact in five categories: (1) whether its compliance was excused under the compliance plan's force majeure clause; (2) whether the State "misrepresented" to the trial court the financial assurance requirements to which White Lion is subject; (3) whether the hazardous waste permit fees awarded in the judgment were "legally valid"; (4) whether the State provided sufficient evidence to obtain injunctive relief; and (5) whether the State improperly sought judgment as to lands owned by White Lion but not subject to the permit or compliance plan. We will address each argument in turn.

**A.     Standard of review**

We review a trial court's grant of summary judgment de novo. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). Rule of Civil Procedure 166a(c) provides that a movant is entitled to summary judgment if the summary-judgment evidence establishes that "there is no

genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or in an answer or any other response." TEX. R. CIV. P. 166a(c); *Am. Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997). "Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal." TEX. R. CIV. P. 166a(c).

## B.  White Lion's noncompliance was not excused

White Lion first argues that its failure to comply with the compliance plan was excused under the plan's force majeure clause, which provides that "non-compliance with one or more of the provisions of this Compliance Plan may be justified only to the extent and for the duration that non-compliance is caused by a 'Force Majeure' event . . . ." The compliance plan defines "Force Majeure" as "an event that is caused by an Act of God, labor strike, or work stoppage, or other circumstance beyond the Permittee's control that could not have been prevented by due diligence, and that makes substantial compliance with the applicable provision or provisions of this Compliance Plan impossible."

According to White Lion, the evidence that it submitted in response to the State's motion for summary judgment raised a fact issue as to whether the force majeure clause applies due to actions taken by third parties that damaged the facility. When it purchased the facility, other buyers purchased equipment located

15

at the facility, and the bankruptcy court required it to give those buyers access to the facility to remove the machinery and equipment that they had purchased. According to White Lion, some of those buyers caused significant damage to the property, resulting in the virtual destruction of the electrical system and disconnection of all electrical power. It estimates that repairing the electrical system, which is necessary to operate corrective equipment, will cost at least $500,000. White Lion has sought to recover damages from certain of the equipment buyers and their contractors, with varying success. It argues that, without such recoveries, the damages caused by these third parties made its "compliance with the Compliance Plan . . . a physical impossibility when it acquired the Property." It also argues that compliance was "impractical and commercially and economically infeasible." Thus, according to White Lion, there is a fact issue regarding whether its noncompliance was excused.

The State argues that White Lion did not preserve this argument for appeal because it did not mention the force majeure clause or the concept of force majeure in its response to the motion for summary judgment. The State is correct. White Lion has waived its contractual force majeure argument on appeal. *See* TEX. R. CIV. P. 166a(c); TEX. R. APP. P. 33.1(a). But White Lion's response argued that compliance was "rendered impractical and commercially and economically

16

[i]nfeasible by damages to the facility by third parties." It has therefore preserved a common-law excuse-by-impossibility argument.[5]

White Lion did not introduce any evidence that it could not control, mitigate, or, after the fact, remediate the actions of third parties at the site, even though it acknowledges that such actions ceased by August 2004, more than a decade before the trial court entered summary judgment. While it attached to its response to the motion for summary judgment pleadings from various lawsuits that it has filed against third parties, none of those pleadings was verified or sworn. At most, those documents demonstrate the nature of White Lion's claims against those parties. They do not demonstrate that the claims are true, much less that the cost of repairing the damage caused by third parties rendered compliance with the compliance plan impossible at any point in time. Nor did White Lion demonstrate that it was unable to pay the costs of the necessary repairs.

We hold that White Lion failed to raise a fact issue with respect to whether its noncompliance with the compliance plan was excused.

---

[5] The State argues that no such excuse is possible because "White Lion's defenses are limited to those set forth in the Compliance Plan and the Texas Water Code." We need not address this argument because, even assuming that the economic impossibility defense is available, White Lion has failed to demonstrate that a fact issue exists regarding that defense.

17

## C.  White Lion admitted that it did not meet its financial assurance requirements

White Lion next contends that the State "misrepresented" facts to the trial court, specifically that (1) White Lion was required to maintain $574,000 in "financial assurance," guaranteeing its performance of its obligations; (2) White Lion never provided any financial assurance to the State; and (3) White Lion was required to maintain financial assurance in the amount set by the original 1988 compliance plan, even though the costs of remaining post-closure work at the facility were much lower.

As a threshold matter, we note that the State adduced evidence that White Lion violated the compliance plan in numerous ways, not merely by failing to provide financial assurance. "When the trial court does not specify the basis for its summary judgment, the appealing party must show it is error to base it on any ground asserted in the motion." *Star–Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995). For the reasons below, we hold that the evidence supports the State's arguments in its motion for summary judgment regarding White Lion's financial-assurance obligations.

TCEQ is required to establish a compliance plan governing "compliance monitoring and corrective action for facilities that store, process, or dispose of hazardous waste in surface impoundments, waste piles, land treatment units, or landfills . . . ."  30 TEX. ADMIN. CODE § 305.401(a) (West 2015). The owner or

18

operator of an affected site must perform the duties set forth in the compliance plan. *Id.* § 335.166(2) (West 2015). He also must establish and maintain financial assurance for the corrective actions to be taken. *Id.* § 335.167(d) (West 2015).

The State sent a request for admission under Rule of Civil Procedure 198.1, asking White Lion to admit that the compliance plan "requires White Lion to provide at least $574,000 in financial assurance for the Facility." White Lion admitted this to be true. White Lion also admitted, in response to another request for admission, that it "has never obtained financial assurance for the Facility." White Lion argues, however, that the permit required a lesser amount of financial assurance than that required by the compliance plan, the permit is the controlling document, and the different amounts therefore raise a fact issue. But the Administrative Code requires White Lion to comply with both the permit and the compliance plan. *E.g.*, 30 TEX. ADMIN. CODE §§ 335.166–.167. While the permit incorporates the compliance plan as part of its terms, the plan is enforceable in its own right. *Id.* White Lion admits that the compliance plan required $574,000 in financial assurance, a requirement that it had not met.

White Lion also argues that the State "misrepresented" to the trial court that the amount of financial assurance required by the compliance plan was $574,000, the same amount set in the first compliance plan in 1988, when the actual requirement is lower. It reasons that the amount required by the Administrative

19

Code is "an amount no less than the current cost estimate" for closure, post closure, or corrective action. 30 TEX. ADMIN. CODE § 37.121 (West 2015). According to White Lion, the "current cost estimate" is lower than the original $574,000 figure due to changes at the facility over the years. In support, it relies on an EPA report from 2003 that purportedly concluded, as White Lion summarizes it, that "there was no imminent endangerment to public health and the environment."

But the report in question does not support such a conclusion. Rather, it indicated that contamination from the facility was "high unlikely" to impact "the drinking and agricultural water supply," but also concluded that "the plume may not be stable" and that the risk of additional exposures "is dependent on actions taken to mitigate the plume," including maintenance of the monitoring and recovery wells on-site. The undisputed evidence shows that each such well has been closed, destroyed, or abandoned. It also shows that the State correctly represented to the trial court the amount of financial assurance required by the compliance plan now in effect: $574,000. Moreover, contrary to White Lion's arguments, the "current cost estimate" is not simply the owner or operator's estimate of the costs associated with a waste site. Rather, that term is defined by statute as "[t]he most recent estimates prepared in accordance with commission requirements for the purpose of demonstrating financial assurance for closure, post

20

closure, or corrective action." 30 TEX. ADMIN. CODE § 37.11(6) (West 2015). The only manner in which either the amount of financial assurance required or the current cost estimate could be decreased is upon a request by White Lion, subject to approval by TCEQ. *Id.* § 37.151 (West 2015). White Lion has never made such a request.

The record thus conclusively shows that the compliance plan requires financial assurance of $574,000 and that White Lion "has never obtained financial assurance for the Facility."

White Lion also argues that it raised an issue of material fact regarding the calculation of civil penalties for its violation of the financial assurance requirements of the compliance plan. Specifically, it argues that Vision Metals provided financial assurance, that it assigned that financial assurance to White Lion, and that the financial assurance remained in effect until January 11, 2005. Thus, it contends that it raised a fact issue as to whether civil penalties could apply for any date before January 12, 2005.

We disagree. The evidence shows that Zurich North America, through its agent, Steadfast Insurance Company, issued an insurance policy to Vision Metals to satisfy the latter's financial assurance requirements. In April 2004, Vision Metals asked Zurich to assign its rights and obligations under that policy to White Lion. The record contains no evidence, however, that Zurich or Steadfast accepted

this assignment.[6] Critically, it also contains no evidence that anyone provided evidence of such an assignment or attempted assignment to the State. Rather, the evidence shows only that White Lion informed the State in August 2004 that "[t]he financial assurance provided by [Vision Metals] will remain in effect with Zurich North America Insurance (Policy No. PLC3572779-04) until January 11, 2005." TCEQ responded on September 20, 2004, as follows:

> We understand that financial assurance for this permit and compliance plan currently is in effect through an insurance policy issued by Zurich North America Insurance to the previous facility owner, Visions Metals, Inc. However, as we stated in our August 27, 2004 letter to you, White Lion, as the new owner and operator, is required to establish financial assurance with[in] six months of the ownership change. To date, this has not been done.

There is thus no evidence that White Lion actually established financial assurance—whether in the form of the Zurich policy or otherwise—and provided it to the State. Rather, White Lion expressly admitted that it never obtained any financial assurance for the facility.

The evidence conclusively established that White Lion assumed responsibility under the compliance plan when it became the transferee of that plan on July 23, 2004. The evidence also conclusively established that White Lion never submitted any required water samples or reports as required by the plan and

---

[6] The policy provides that it "may not be assigned to a successor owner or operator of any 'waste facility' without the consent of [Steadfast] which shall not be unreasonably withheld, delayed or denied."

failed to prevent the destruction, removal, or abandonment of the recovery and monitoring wells or to repair or replace the wells after they were destroyed, removed, or abandoned. Thus, White Lion was in continuous violation of the plan from that date through the date of the summary-judgment hearing on July 29, 2013, a period of 3,294 days. *See* discussion in Section E, *infra*. The evidence also conclusively showed that White Lion's deadline for establishing financial assurance was October 6, 2004. It had not established financial assurance by the summary-judgment hearing, 3,218 days later, resulting in additional violations of the plan. Under the Water Code, the civil penalty for violations of the compliance plan shall be not less than $50 nor more than $25,000 for each violation, and "[e]ach day of a continuing violation is a separate violation." TEX. WATER CODE ANN. § 7.102. The State stipulated to the minimum penalty for these violations of $50 each. The trial court thus awarded $50 per violation for a total of 6,512 violations, or $325,600. The evidence raised no question as to the dates for which the penalties should be imposed, and the trial court therefore did not err in its imposition of penalties.[7]

---

[7] On rehearing, White Lion argues that it has raised fact issues regarding whether the State (1) "failed to mitigate its damages by failing to timely file a claim against the [prior owner's] insurance policy" and (2) is estopped from recovering due to its own dilatory conduct. White Lion did not make either of these arguments in its brief on appeal. Accordingly, it has waived them. TEX. R. APP. P. 33.1(a). Even to the extent that these arguments might have been implied in White Lion's briefing, they have no merit. This is not a case for damages, but for civil penalties,

**D.    The trial court properly awarded the State unpaid hazardous waste facility fees**

According to White Lion, it never received a bill from TCEQ for permit fees for the years 2009 through 2013, nor did TCEQ make a demand for such fees until the State filed its motion for summary judgment. White Lion also argues that the permit expired in 2009. It concludes that these facts raise "fact questions as to whether these hazardous waste permit fees are legally valid, and in particular any fees accruing after the Permit expired in 2009."

White Lion does not attempt to explain why its obligation to pay hazardous waste facility permit fees, a statutory obligation imposed by Section 361.135 of the Health and Safety Code, could be contingent on receipt of an invoice or bill of any kind. *See* TEX. HEALTH & SAFETY CODE ANN. § 361.135 (West 2010). It did not raise this argument in response to the motion for summary judgment, but asserted it for the first time in its motion for new trial. Because White Lion did not timely make this argument to the trial court in opposing the motion for summary

---

in part for White Lion's own failure to obtain an insurance policy as required by statute. *See* 30 TEX. ADMIN. CODE § 335.167(d) (West 2015). White Lion does not and cannot demonstrate that the State had any obligation to "mitigate" its recovery of penalties for White Lion's noncompliance. Further, the circumstances of this case do not "clearly demand" application of the doctrine of estoppel to the State "to prevent manifest injustice," given White Lion's decade-long failure to comply with its obligations despite notices of violation and the filing of this lawsuit. *See Tex. Dep't of Transp. v. A.P.I. Pipe & Supply, LLC*, 397 S.W.3d 162, 170 (Tex. 2013).

24

judgment, it has waived it.  TEX. R. CIV. P. 166a(c); *see also* TEX. R. APP. P. 33.1(a).

White Lion also made no argument related to the permit's 2009 expiration in response to the motion for summary judgment.  Rather, it raises those arguments for the first time on appeal.  We therefore hold that it has waived any argument based on the expiration of the permit.

**E.    The trial court did not abuse its discretion in issuing a permanent injunction**

White Lion contends that the trial court abused its discretion in entering a permanent injunction because it failed to consider all of the summary judgment evidence.  Although White Lion does not specify which evidence it alleges that the trial court ignored, the essence of its argument is that it "never violated or threatened to violate the Permit or Compliance Plan and, in fact . . . did everything in its power to comply, despite other circumstances beyond [its] control that could not be prevented by due diligence."  It also argues that the EPA and a contractor hired by White Lion both determined that the contamination on the property is decreasing; therefore, according to White Lion, the trial court should not have granted an injunction.

Texas Water Code Section 7.032 gives TCEQ the right to enforce its rules and permits by seeking an "injunction or other appropriate remedy."  TEX. WATER CODE ANN. § 7.032(a) (West 2008).  When a statute provides for injunctive relief,

25

"the statute's express language supersedes the common law injunctive relief elements such as imminent harm or irreparable injury and lack of an adequate remedy at law." *West v. State*, 212 S.W.3d 513, 519 (Tex. App.—Austin 2006, no pet.); *see also Rio Grande Oil Co. v. State*, 539 S.W.2d 917, 921 (Tex. Civ. App.—Houston [1st Dist.] 1976, writ ref'd n.r.e.) (State need only meet statutory provisions of Securities Act and is not required to otherwise show probable injury); *Gulf Holding Corp. v. Brazoria Cnty.*, 497 S.W.2d 614, 619 (Tex. Civ. App.—Houston [14th Dist.] 1973, writ ref'd n.r.e.) (State need not prove irreparable injury to be entitled to injunction under Open Beach Act). Thus, "[w]hen it is determined that a statute is being violated, it is the province and duty of the district court to restrain it, and the doctrine of balancing of equities does not apply." *Gulf Holding Corp.*, 497 S.W.2d at 619.

The record demonstrates conclusively that White Lion never fully complied with the compliance plan. In addition to its failure to provide the required financial assurance, the evidence demonstrates conclusively other violations. For example, the compliance plan required White Lion to install and maintain a groundwater monitoring and "corrective action" system with specific components, including various types of wells; sample, recover, and treat groundwater; and file various reports regarding White Lion's compliance with the plan and the status of the site. But the affidavit of TCEQ employee Elijah Gandee shows that, by July 2013, the

26

"corrective action recovery and monitoring wells had been removed from the Property without authorization and/or had been improperly abandoned." The groundwater recovery and monitoring system had also been destroyed or removed, the wells had been plugged and abandoned without required approvals, and one well head had been cut off, leaving an open hole. White Lion failed to submit any of the reports required by the plan. It never took any required samples or maintained any required records. The evidence thus conclusively disproves that White Lion raised any fact issue as to whether it violated the compliance plan.

The EPA report has no bearing on White Lion's violations of the plan. The "post-judgment inspection" report prepared by White Lion's consultant was not part of the summary-judgment record. Any argument based on that report is waived. TEX. R. CIV. P. 166a(c).

We hold that the trial court did not err in entering a permanent injunction requiring White Lion to comply with the compliance plan.

## F. The summary judgment order was not overbroad

Finally, White Lion argues that the trial court erred by granting injunctive relief affecting land not subject to the compliance plan. This argument is based on a faulty premise.

The trial court's summary judgment order was a modified form of the proposed order submitted by the State. Both the proposed order and the order

27

entered by the trial court included a definition of the term "Property" as including a total of approximately 172.19 acres. The trial court, however, struck all portions of the proposed order that referenced the term "Property," other than the definition. The only injunctive relief that the trial court granted was to require White Lion to "comply with each limitation, requirement, and condition of the Compliance Plan." Thus, nothing in the judgment, other than the unused definition of "Property," mentions or affects land not covered by the compliance plan.

Because White Lion has failed to demonstrate that any issue of material fact precluded summary judgment, we hold that the trial court did not err in granting summary judgment to the State.

## Conclusion

We deny all pending motions and affirm the judgment of the trial court.


Harvey Brown
Justice

Panel consists of Chief Justice Radack and Justices Brown and Lloyd.